Horne, *et al.*, *vs.* The State.

---

BEN HORNE, *et al.*, plaintiffs in error, *vs.* THE STATE, defendant in error.

1. An indictment should be "in the name and behalf of the citizens of Georgia;" if these words be omitted, on exception taken at the proper time, the indictment will be quashed; such exception is not good in arrest of judgment.
2. In all cases where parties are jointly indicted for an offence which does not require the joint act of two or more persons to commit it, the defendants, upon application, have a right to sever on the trial; otherwise as to those offences which require the joint act of two or more to commit them.
3. During a trial for murder, the prosecution asked a witness a question "to ascertain the condition of the mind of the deceased towards the prisoners after the mortal wounds were inflicted, whether kind or malevolent;" the Court, on objection, refused to permit the witness to answer the question, remarking "that Horne (the deceased) had a right to be mad; he thought anybody shot had a right to be mad:" *Held*, that this remark was error.

Indictment for murder. Tried before Judge VASON. Sumter Superior Court. September Special Term, 1867.

The indictment charged Ben Horne, Scott Horne, Edmund Horne, Richard Horne and George Jackson, Jr., negroes, with the murder of Joab W. C. Horne, on the 12th August, 1867, in said county.

The defendants were arraigned.

1st. A motion was made to change the venue. The Court refused to entertain the motion, until efforts to obtain a jury in the county had failed.

2d. The indictment was demurred to, because in one count all of the defendants were charged with the murder, and in the other count three of them were charged with murder as principals in the first degree, and the other two as principals in the second degree. The demurrer was overruled.

The defendants plead not guilty.

3d. When the Solicitor·General proceeded to organize the petit jury, the Court required him to ascertain from the jurors under oath, whether or not they had registered, according to General Pope's order ; four of the petit jurors were excused because they had not registered, and their places were supplied by registered persons. Each juror was examined as to the fact of registration, and if found not to be registered, he was set down for cause. The Court announced that it did not decide upon the legality of this proceeding, that he would leave that an open question, that parties who considered themselves aggrieved thereby, might redress themselves.

When the different panels of jurors were put upon the prisoners, they challenged the array because they were organized under said military order. The Court overruled these challenges.

4th. After the first juror had been sworn, defendants moved to sever on the trial, stating that they intended to sever, but inadvertently failed to make the motion earlier. The State objected, on the ground that the motion came too late. The Court overruled this objection, and required the defendants to assign special reasons for severing. Defendants assigned specifically that they wished to use each other as witnesses. The Solicitor General and associate counsel for the State, consented that defendants should testify as if severed, and thereupon the Court refused the motion to sever.

5th. The Court ruled out the evidence of Laura Horne, (as specified in the brief of testimony between the two * *.) (The record leaves it somewhat uncertain whether the Court

7

ruled out her testimony as evidence for any of the defendants, or only ruled that her testimony was not evidence for her husband, Ben Horne; counsel for the State differed as to this in the argument, but the latter seems to have been his ruling.)

6th. In the progress of the case, the Solicitor General asked a witness the condition of deceased's mind towards the prisoners after the mortal wound had been given, whether kind or malevolent. The Court refused to allow the witness to answer the question, remarking " Horne had a right to be mad, he thought anybody shot had a right to be mad."

7th. When the nineteenth challenge allowed defendants was being considered, they asked the Court to decide how many challenges they were entitled to. The Court said he would not decide till the question was made. When their twenty challenges were exhausted by the defendants, the question was again made, and the Court held that they were entitled to one hundred challenges.

The testimony was as follows:

CULLEN HORNE testified that deceased was wounded on Monday night, 12th August, 1867, in Sumter County, and died about 12 o'clock on Tuesday night, 13th August, 1867 ; he knew no difficulty between deceased and Ben, Scott and Edmund, previous to the killing ; he saw deceased leave his house on the night of the shooting, to see a sick negro woman, when he met Ben (who had a double-barrelled shotgun) near Ben's and Edmund's house; he did not see deceased and Ben in any struggle whatever—as witness approached within ten feet, he saw Ben jump back and fire at deceased, saw deceased place his hands on his bowels as if wounded. Witness approached within four feet, when Ben fired again at deceased—this shot did not take effect, witness thought.

Deceased then took some splinters of lightwood out to one house, threw down some and carried the balance to another, pretending he was going to fire some of the cabins.

Witness had been in the field during the day. Four of the prisoners had lost two hours that day, and witness had given notice that they would be charged with the lost time.

They objected to this, left the field, and went to the house. Prisoners, before that day, had habitually hauled a load of green corn in the morning, to feed. Witness asked them to haul a load that noon, as they had three hours at noon to rest. Contrary to order, they hauled after the rest-hours were out. Witness changed the hour for hauling, because it was cooler to pull fodder in the morning and more convenient to haul the corn at noon. When deceased went out to bring the negroes back, he was armed with a pistol—Ben and Edmund and Richard each owned a gun and a pistol, and Scott and George each owned a gun.

*Re-examined:* Deceased made no effort to burn the house; difficulty occurred out of the house; deceased could not have burned the house if he had desired to; found the lightwood outside the houses about ten feet from each; deceased did not habitually carry weapons about the plantation, but he buckled on his pistol when he went out that night; the negroes were in the habit of using their fire-arms on Saturdays and Sundays; deceased, when he thought he was going to die, stated that Ben, Edmund and Scott shot him; witness found a gun unloaded lying on the ground near the place where Ben shot deceased.

As Ben ran and witness pursued, there was other firing. Witness pursued about one hundred yards, and returned and found deceased on all-fours, and his little son over him. Deceased was bruised on the face, mouth, nose and shoulders, his eye was cut, there was one gun-shot wound in front on the right side, one in the rear and to the right of the spine.

Witness was first attracted by deceased ordering Ben to put down his gun; he was fifty or seventy-five yards off, but it was still and he could hear all that was going on. Next day Captain Robinson found guns under George Jackson, Sr.'s house, and three guns were found in houses of different negroes. George Jackson, Jr. staid in the same house with George Jackson, Sr. Witness heard no shooting on the evening previous; saw prisoners next in jail; was with deceased all the time. Deceased, when he was conscious of his approaching death, said Ben, Scott and Edmund shot him, and

said he regretted very much that he had been murdered by his former slaves, whom he had raised from childhood.

*Cross-examined:* Deceased, immediately after supper, went to see the sick negro woman, and immediately returned and reported that there were no negroes on the place. The prisoners were all employed on the place and had houses assigned to them. The prisoners all quit the field about four o'clock without the consent of witness, who was the overseer. When deceased returned from seeing the sick negro, after studying some time, he remarked to his family that he had hit upon a plan to bring back the absent negroes, who, deceased thought, were out consulting.

DR. W. A. GREEN testified that he visited deceased as a physician; he had two gun-shot wounds; the ball struck deceased behind, three inches and a half behind the hip bone, a musket-ball wound and the one which proved fatal. Another wound on deceased was by a pistol-ball in the lower part of the bowels, but it did not enter the abdominal wall. The head and face were contused and lacerated, deceased was dreadfully mutilated, particularly was there a severe wound above the eye. The musket-ball wound was shot from behind and was fatal, that ball did not emerge. When both witness and deceased thought deceased was dying, deceased said the attack was unprovoked, that he was shot from behind by Edmund, and that Edmund and Scott were standing in the jamb of the chimney outside, and that Ben shot at him with a double-barrelled gun and shot twice, that he was immediately shot from behind by Edmund, and they afterwards beat him with their pistols. He used the word "they," not calling any names, when he spoke of the beating. Deceased said he did not remember whether Scott shot, but Scott had a pistol.

DR. WESTBROOK testified that he was a physician and examined the wounds after deceased died. He deemed the wound over the right eye a mortal fracture; he was not certain as to the wound in the bowels. Called back he said the wound over the eye was either by a pistol ball or the cock of a hammer. Don't recollect any case which did not produce

coma or convulsions.   The wound on the eye would not produce unconsciousness, perhaps, as it would from other points on the head, though it would produce death.   He thought the ball extracted struck a button or something, but other balls went into the *anus.*

Dr. Robert Haines testified that he was a practicing physician, the wound in the bowels or the one in the back either, would produce death.   He examined the wounds carefully but did not probe them, wounds on the head are very irregular in their effects.

James Murray testified that he was at deceased's house at the time of the difficulty; the first he knew of it was the firing of a shot-gun in the direction of Ben's and Edmund's house, the next gun he heard was a shot-gun, and immediately after this six or eight pistol-shots were fired in rapid succession.   Went in a few seconds to where deceased was lying, and found his little son trying to help deceased up.

None of prisoners were to be seen.   (Witness described the wounds substantially as the other witnesses.)   Took deceased into the house and went for Dr. Green.   When the doctor came, deceased thought he would die and would not believe otherwise, and said Ben and Edmund shot him, and that Ben shot him first, twice, before deceased fired, and that Scott and Edmund shot him from the rear, and that Edmund beat him.

Laura Horne, freedwoman, testified: she saw Edmund shoot at deceased twice; Richard Horne and George Jackson, Jr., were before Richard's house on the steps, at the time of the shooting, with their guns in their hands, about fifteen or twenty yards from the shooting.

*Cross-examined:* She said no one had been talking to her, except counsel for the State in the court-house.

She saw Judge Horne (deceased) come to witness' house, he asked for an axe, a woman gave him one.   He told Lucy to get out of the house, as he was going to burn it.   He split a turn of lightwood, threw down a turn before witness' house door, came in, put a torch into the fire and then went out. She saw deceased shoot; * heard deceased curse somebody,

heard deceased say that night "Lay down your gun, G—d d———n you, lay down your gun, your life's right in my hands, lies·right in the muzzle of my pistol; but a few more words do I speak unto you before I blow your d———n brains out." (The gun was not laid down.) He put his pistol in Ben's breast. It was Ben, my husband. * Edmund and Ben staid in the same house.

THOMAS HORNE, brother of deceased, testified that when deceased believed he was dying, but while he was perfectly rational, he said Ben, Edmund and Scott shot him, that Ben shot him twice first, and after that Edmund and Scott shot him and beat him.

CAPTAIN J. W. ROBINSON also testified to declarations of deceased; deceased said ——— (here occurs an unexplained blank in the brief,) found two guns, a musket and guns and pistols belonging to the murderers. Witness examined the guns found, one was heavily charged, one ordinarily charged, and all with bright, new, fresh caps except one, i. e. the musket out of which he could not extract the ball.

*Cross-examined:* Found the parties—three of them in jail. They came to see witness about one o'clock P. M., on the day after the night of the shooting.

Here the State closed.

The defendants' evidence was as follows:

MARCUS FURGUSON, freedman, was in Louisa's door, twelve steps from Ben's house, on the night of the killing: saw deceased cut an armfull of lightwood and say he was going to burn the houses, and he went to Ben's house. Ben was lying on the bed sick. Deceased went to the fire-place. Ben picked up his gun and and walked out, and deceased followed him, saying to Ben after walking up to him, "G—d d———n you, what are you doing with that gun? Put it down, or I'll blow your d———n brains out. Your life is in the muzzle of my pistol." He made these same remarks ten or twelve· times. Deceased had a pistol in his hands and shot first; he shook the pistol in Ben's breast three times before he shot after deceased shot; Ben returned the fire,

threw down the gun and ran. Witness heard several shots immediately after that, but don't know who fired them.

*Cross-examined:* Was living on deceased's place at the time; was sworn before at the inquest, but did not then swear ignorance of the difficulty. Richard and George were standing at Hagar's house with their guns; did not see Scott or Edmund; did not see deceased's little son over him; shot so much round witness that he ran; was facing the gun Ben shot; Ben shot once; after the shots were fired between Ben and deceased, he saw Cullen Horne run from the house towards Ben; heard only two shots fired; went to Hannah's house that night.

Deceased and Ben were about twenty steps from Hannah's house when the shooting commenced; was in ten steps of deceased when he was shot before Louisa's door. Did not see prisoners with their guns the evening before the shooting; he was in the yard till night. Prisoners had their guns that evening; did not see them load their guns. Witness did not say in presence of Dr. Haines and Darden and others, on the inquest, that he knew nothing about the case.

WINNY WILSON, freedwoman, was present in the house next to Ben's house, and about ――― steps off. Heard deceased say " How dare you come out of my house with your weapon, when I come in my house to burn it down? Lay your weapon down, G—d d――n you, or I will blow your brains out. Your life is in the muzzle of my pistol." Heard the gun and pistol—the gun first; heard the other shooting, but don't know who it was; did not go out of the house; only judged by the sound and voice; did not see the parties; am familiar with Ben's and deceased's voices.

*Cross-examined:* Came to the door; could see their heads but could not distinguish the parties. Deceased said to Ben, " How dare you come out of my house when I come in to burn it down?" Did not see George or Richard that night; saw nothing at all; was not sworn at the inquest, and did not tell Darden or any one else that she knew nothing about the case. Prisoners came to the house about an hour by sun, and staid in the yard. Did not hear anybody but deceased,

nor hear his little son beg them to get off deceased, nor heard Cullen come out; heard nothing only what deceased said and the guns shooting, heard no gun shoot that evening.

In rebuttal, the State proved substantially by Dr. Haines, A. R. Buford and C. S. Darley, that they heard Marcus at the inquest say, that when the difficulty began he ran off and knew nothing about the difficulty, and by J. J. Murray, a son-in-law of deceased, that he saw Marcus load a gun on the evening of the shooting.

THOS. L. MURRAY testified; before deceased died, witness heard Richard say they all quit the field in the evening before the shooting, that they had their guns, that he (Richard) tried to shoot off his gun, but couldn't, his gun wouldn't fire at the shooting, and that he ran off and hid it in a brush-heap.

GEORGE HORNE testified; he was twelve years old; after the guns commenced firing he went out to his father; when he got to him, he saw Edmund on deceased, beating him. Witness told him to get off, which he did, and ran off over the potato patch.

8th. The Court, on being asked by the prosecuting attorneys to charge that in case of conviction the jury could recommend defendants to mercy, stated that he doubted the right of the jury to do so, but as the request was also made by defendants, he would give it in charge as the law; after the jury had retired, the Court examined the statute and called the jury back and charged them that it was their undoubted right to recommend the defendants to mercy if they thought proper so to do.

9th. When the verdict of the jury was brought into Court and handed to the Solicitor General, he objected to receiving it because it was not in conformity with the pleadings. (What it was does not appear.) The Court asked to see the verdict, and after looking at it, ordered the Solicitor General to read it, which was done, and the solicitor then handed the verdict to the clerk to be recorded, when defendants' attorneys asked to see the verdict, and before it was recorded it

Horne, *et al.*, *vs.* The State.

was handed to them. The Solicitor General asked them if they wished to poll the jury, they answered "yes."

Upon polling the jury, the first nine answered that it was their verdict; the tenth man, A. A. Adams, stated that that was his verdict in the jury room, but if it did not conform to the pleadings, he wished that the jury be recharged and returned to their room, because the jury did not wish that the county should be put to additional expense from any informality in the verdict or want of conformity to the pleadings. While this juror was making this explanation, and before any decision by the Court, the defendants withdrew their demand to poll the jury.

The verdict was then returned to the jury and the Court charged them as follows:

"Gentlemen, I charge you that if several persons agree and conspire together with a common intent to commit a crime, and in prosecution of this common intent the act is done by only some of them, and all are present, consenting and agreeing thereto, though not actually taking a part therein, then all such as are present and concurring, are guilty alike with those who do the acts. Apply this principle to this case, and such of the defendants as the evidence satisfies your minds, beyond a reasonable doubt, were thus engaged, you ought to find guilty generally, or as principals in the first degree."

The jury retired and returned the verdict in the following form:

"We, the jury, find Ben Horne, Scott Horne, Edmund Horne, Richard Horne and George Jackson, Jr., guilty of murder, and recommend George Jackson to the mercy of the Court.                    ASBURY A. ADAMS, *Foreman.*

The defendants moved to arrest the judgment: "Because the bill of indictment fails to state that the grand jurors charged and accused the defendants "*in the name and in the behalf of the people of Georgia,*" and failed to show any authority of said jury to charge and accuse the prisoners of any crime." The indictment was as follows:

"STATE OF GEORGIA, COUNTY OF SUMTER: The grand jurors, sworn, chosen and selected for the county of Sumter,

to-wit:" (giving their names, etc.,) "on their oaths do charge and accuse Ben Horne," etc.

This motion was overruled.

Defendants made a motion for a new trial on the grounds hereinbefore stated and numbered, and on the further ground that the verdict was strongly against the law and the evidence.

The Court overruled the motion for a new trial as to all of the other defendants except George Jackson, Jr.    To him a new trial was granted.

Ben Horne, Edmund Horne and Scott Horne, were sentenced to be hung on the 22d November, 1867, and Richard Horne was sentenced to the penitentiary for life.

Those sentenced to be hung excepted to the several judgments, rulings and orders of the Court, and assign them as error.

C. T. GOODE and SAMUEL ELAM, for plaintiffs in error.

N. A. SMITH, Solicitor General, and W. A. HAWKINS, for the State.

WALKER, J.

1. By the Revised Code, section 4535, the form of an indictment should be: "The grand jurors selected, chosen and sworn for the county of —— to-wit: in the name and behalf of the citizens of Georgia, charge and accuse," etc.   By section 4536, all exceptions which go merely to the form of an indictment, shall be made before trial; and no motion in arrest of judgment shall be sustained for any matter not affecting the real merits of the offence charged in the indictment.    After the rendition of the verdict, the defendants moved to arrest the judgment because the bill of indictment fails to charge defendants "in the name and behalf of the citizens of Georgia."    Did this omission affect the real merits of the offence charged in the indictment?   Was it not an exception which went merely to the form of the indictment? The exception being merely to the form of the indictment should have been taken before trial.

2. Ought the Court to have permitted the defendants to sever on their trial? This is an important question, and has received our careful consideration. By the old law, when two or more defendants were jointly indicted, any one might be tried separately, except such offences as required the concurrence of two or more to constitute the crime; in such cases, the defendants should be tried jointly. Cobb's Dig. 841. The act of 1856, Pamp. Acts, p. 266, amended this, and authorized the trial of one or more in those cases which require the joint act of two or more to constitute the crime. The history of this act, as we understand it, and the reason for its passage was, that in many cases of riots, etc., some of the parties would avoid arrest, and one party might be held for years without being tried, because the other party charged in the indictment could not be brought to trial. This was especially so in the counties bordering on the State line, and proved to be in many cases a great hardship to those parties who were indicted for such offences and remained within the jurisdiction of the court. They could not be tried separately, and they could not demand a trial, (McAlester vs. The State, 17 Ga. R., 618,) and were liable to be bound indefinitely to attend upon an indictment for an offence for which they could not be tried. The act of 1856 intended to remedy this evil and allow any one of such defendants to be tried separately, without waiting for the arrest of others charged in the same indictment. The effect of this amendment was to advance the ends of justice and secure to the citizen his right to a speedy and public trial. Sec. 4595 Rev. Code, intended to embrace the provisions of the Code of 1833, as amended by the act of 1856, and authorized the separate trial of defendants for all offences. In Caldwell vs. The State, 34 Ga. R., 10, this section was before the court for construction and the court seemed to hold that the court is the repository of the discretion given by the statute to say in what cases a defendant may be tried separately, though jointly indicted. The court, however, there say, (p. 20,) "We do not say it is an unbridled, uncontrollable discretion; but where severance is demanded as a right, unsupported by cause shown and re-

fused, we are wholly indisposed to interfere with the exercise of the discretion." That was an indictment for riot, a crime which required the joint act of two or more to constitute it, and the defendants demanded a separate trial as a matter of right, upon mere motion, and without any special cause shown therefor. Under that state of facts, and in that class of cases, we think the decision was right, and we affirm it. This case, however, is a very different one.

Here the defendants were jointly indicted for an offence of which one might be guilty and all the others innocent; this is one of the other class of cases referred to in the statute. The defendants stated that they wished to use each other as witnesses on the trial; this was assigning a special reason for severing on the trial. We all from our experience know how difficult it is to have a fair trial when several parties are on trial and they are introduced as witnesses for each other. The witness cannot testify in his own favor, and he is not bound to criminate himself. Besides the confusion of several issues being passed upon at the same time by the same jury, affecting the lives of several persons, and some of those persons on the stand as witnesses, is not likely to enable the jury to do full and impartial justice to each defendant. In this case the wife of one of the defendants was a witness and there is a difficulty in determining from the bill of exceptions what the court ruled as to certain portions of her testimony. Even the counsel for the State, in the argument before this court, differ as to what was decided. It originates from complicating too many issues to be decided at once. The humanity of the law did not intend to deprive three men of their lives by a trial thus confusedly conducted. The court should have granted their motion to sever on their trials, and then the attention of the court, counsel and jury could have been fixed upon the party on trial; and justice would much more likely be attained in this manner than by the course pursued on the trial. In a case of this sort the fact that the defendants wished to use each other as witnesses ought to have been sufficient special reason for severing on the trial, even if the court had the right to refuse it without special cause shown,

and we would have felt bound to reverse his ruling on this point as a matter of discretion. The court must so use his discretion as not to abuse it, and if he improperly use his discretion this court will control it. But as a general rule we hold that in all cases where parties are indicted for an offence which does not require the joint act of two or more to constitute the offence, the defendants upon application have a right to be tried separately ; the rule is otherwise in those cases which require the concurrence of two or more in their commission ; in cases of this class the matter is subject to the legal discretion of the court before whom the trial takes place.

3. The remark of the judge in ruling out a question asked by the State's counsel " that Horne had a right to be mad; he thought any body shot had a right to be mad," was improper ; and such an impropriety as we should be constrained to correct, if there were no other error in the case. It was certainly an intimation by the judge during the progress of the cause as to the guilt of the accused ; and would make it obligatory upon this court to grant a new trial. Rev. Code, sec. 3183. Horne had no right to be mad unless he had been wronged ; and whether defendants had wronged him or not, and if so of how great a degree was that wrong, was the issue then upon trial. The judge should discharge his duties with impartiality. Let him so administer the law that it may appear, as indeed his feelings should be, that it is wholly indifferent to him which party may succeed, provided the law is administered. Justice is represented as blind, so that she may not know either party, and with a firm hand hold the scales even. The jury should not from any conduct or word of the judge be able to know what he thinks the verdict should be. Let him discharge with impartiality those duties which the law imposes upon him, and leave the jury free to perform those imposed upon them, according to law and the facts of the case.

Judgment reversed.