12567

STATE v. FRANCIS *ET AL.*

(149 S. E., 348)

(On Rehearing, Aug. 30, 1929)

18

*Messrs. Edgar J. Oliver, Geo. W. Beckett, Charles J. Colcock* and *Alfred Wallace,* for appellant,

*Solicitor Randolph Murdaugh, W. Brantley Harvey, Wm. N. Levin* and *J. Heyward Jenkins,* for the State,

January 25, 1929.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The grand jury of Beaufort county charged Paul Francis, Frank Francis, Ethel Francis, Abraham Gadsden, Sam Simmons, and Robert Adams, all colored, with the murder of E. F. Langford, white, a rural policeman of Beaufort, on June 6, 1927. At the trial of the defendants before his Honor J. Henry Johnson, presiding Judge, at the June, 1927, term of the Court of General Sessions of Beaufort county, the petit jury, by their verdict, convicted the defendant Sam Simmons of manslaughter; the defendants Ethel Francis and Robert Adams, of murder, with recommendation to mercy; and the defendants Paul Francis, Frank Francis, and Abraham Gadsden, of murder without any recommendation.

The defendants Paul Francis, Frank Francis, and Abraham Gadsden, who are sentenced to death by electrocution,

and the defendant Ethel Francis, who was sentenced to imprisonment for life in the State penitentiary, have appealed from the judgment and sentences, respectively imposed upon them in the lower court, to this court. There is no appeal on the part of Sam Simmons and Robert Adams.

The exceptions on the part of the appellants Frank Francis, Paul Francis, and Ethel Francis are twenty-six in number, and are so numbered consecutively.

The appellant Gadsden has set up eight exceptions, numbered consecutively from 27 to and including 34. By his twenty-eighth, twenty-ninth, thirtieth, thirty-first, and thirty-third exceptions, he adopts the twelfth, thirteenth, fourteenth, and fifteenth exceptions of his co-appellants. He attempts also by his thirty-second exception to adopt practically all the exceptions of the other appellants. His twenty-seventh and thirty-fourth exceptions relate mainly to the case against himself.

Many of the exceptions do not comply with the rules of this Court, and quite a number of them are more in the nature of arguments than exceptions. The Court, however, because of the gravity of the crime charged against the appellants, and the serious consequences resulting to them as the result of their trial below, will consider all the exceptions as if they fully complied with our rules. But for the sake of brevity, where the exceptions of Gadsden and the other appellants are the same, we shall consider such similar exceptions together. Also, in some instances where two or more of the exceptions raise the identical question in a different manner, such exceptions will be disposed of at the same time.

The appellants Paul Francis, Frank Francis, and ██ Ethel Francis moved for a severance as to themselves from the other three defendants on trial. We do not find in the record a similar motion on the part of the appellant Gadsden. The motion was based upon these grounds: That Frank Francis would plead self-defense; that Paul Francis, father of Frank, and Ethel Francis, wife of

Frank, had the right to defend their relative, and their defense would be based upon that right; that after, or during, the difficulty, without the knowledge of Paul, Frank, or Ethel Francis, the other defendants, some of whom were entire strangers to the Francis appellants, and who had no community of interest with them, injected themselves into the controversy, and, without any assistance on the part of the Francis appellants, these other persons brought about the death of the deceased; that the defense of the other defendants might not be, and probably would not be, the same, as that of the three Francis; that there could be no equality on the part of the defendants in exercising the right of challenge to the jury, and because of the state of public feeling against some of the defendants. The motion was refused by the presiding Judge, and such refusal is assigned as error in the first exception.

It has been repeatedly held by this Court that a motion for a severance and separate trial on the part of one or more defendants in a case, where several persons are jointly charged with a criminal offense, is addressed to the discretion of the trial Court. See *State v. Kenny,* 77 S. C., 236, 57 S. E., 859; *State v. Wade,* 95 S. C., 387; 79 S. E., 106; *State v. Brown,* 108 S. C., 490; 95 S. E., 61; *State v. Hanahan,* 111 S. C., 58, 96, S. E., 667; *State v. Jeffords,* 121 S. C., 443, 114 S. E., 415.

In the *Brown case, supra,* the three defendants who appealed based their motion for a severance on the ground that their defenses were antagonistic to the defenses of the other two defendants in the case. Even there, this Court refused to interfere with the ruling of the trial Judge when he refused the motion to sever.

Under the authorities cited, we are unable to find any abuse of the discretion vested in the Circuit Judge, and the first exception is overruled.

The second exception relates to the failure to grant a continuance as to the appellant Frank Francis, on the ground that the physical condition of that appel-

lant was such at the time that he could not safely go to trial. During his trial, Frank Francis was on a cot in the court-room; he had a broken thigh, and his limb was set in some kind of a mechanical contrivance. It was stated by his counsel "that his mental condition was necessarily such that he could not have with him the mental faculties with him that his case demands to stand the cross-examination of counsel for the State." Without any comment at the time the motion for continuance was made, the Circuit Judge refused the motion. When a new trial was asked because of the former ruling of the Court as to a continuance, the trial Judge took occasion to make some remarks as to his refusal to grant the requested continuance. He stated, in substance, that he was more embarrassed at the time the motion was made than he was after he had heard Frank Francis testify as a witness in the case; that at the time the motion was made, he was not in position to observe the condition of Frank Francis, other than to notice that he was unable to sit up; that no showing had been made from a physician as to the condition of Frank Francis at the time of the making of the motion; that the only thing before the Court was the conclusion on the part of Frank's counsel; that after hearing Frank testify, he was satisfied that his physical condition did not in any way interfere with his mental faculties; and that upon cross-examination Frank handled himself as well as any of the defendants who took the stand, and better than most of them. In addition to the matters to which the Circuit Judge called attention, Dr. Foster, when offered as a witness for one of the defendants, in testifying as to the physical and mental condition of Frank Francis, said that, in his opinion, Frank Francis' mind was clear at the time of the trial.

In their argument, counsel for appellants cite, as authority to sustain their exception to the Court's ruling, the case of *State v. Lowman,* 134 S. C., 485, 133 S. E., 457. We do not find in that case any holding of this Court on a motion for continuance; in fact, the record shows affirmatively, "No motion was made for a continuance; counsel for each de-

fendant announcing in open Court that they were ready for trial."

The cases sustaining the discretion of a trial Judge in motions of continuance are too numerous to require citation. We take the time, however, to refer to two of these cases.

In the case of State v. Lee, 58 S. C., 335, 36 S. E., 706, two physicians certified that the nervous system of the defendant was much disturbed; that his physical condition was very bad and they did not think he was in a fit condition to go to trial at the time. The Circuit Judge ordered the case to trial anyway, and stated that he was not impressed with the unsatisfactory, vague, and unsubstantial nature of the grounds for the motion, and that the defendant's own appearance and manner seemed to contradict the certificates of the physicians; and that the result showed conclusively that the defendant was strong enough to stand the ordeal of the trial. On appeal, this Court refused to disturb the ruling below on the motion for continuance.

In the case of *State v. Underwood*, 127 S. C., 1, 120 S. E., 719, one of the grounds on which a motion for continuance was based was the alleged hostile atmosphere surrounding the defendant, as evidenced by applause of the audience when the Judge refused a former motion for continuance. This Court held there was no error.

We see nothing in this case to change the general rule of the law, so often held by this Court, that motions for continuance are addressed to the sound discretion of the trial Judge, and the exception questioning the failure to grant a continuance must be overruled.

Refusal of the Court to grant a change of venue is assigned as error in the third exception. The motion seems to have been made without any formal notice, or grounds thereof, having been formally served. Counsel for appellants, in open Court, stated: "There is a great deal of public sentiment in this community and in this county, and that sentiment is evidenced by the fact that the officers

of the Court and the County officers have thought it necessary to have the Governor of the State send to this community troops for the purpose of protecting these prisoners from physical violence and the Court House is now under guard."

In passing upon this motion, Judge Johnson stated there was no satisfactory showing, other than the statement of counsel. He further stated that he did not know that the presence of the State militia could be attributed to the sheriff or other officers; that perhaps it was due to himself; that he had investigated carefully for some weeks the state of public feeling in the county, and was gratified to find no evidence of any high state of feeling or ill feeling toward the defendants from the citizens of Beaufort County; that the only rumors or indications of trouble his investigations had disclosed came from residents of other counties, who could not sit upon the jury in the trial of the case; that he had advised the Governor that if a call for militia was made that he would approve of it; that he saw nothing to cause him to feel that the defendants would not receive a fair and impartial trial in Beaufort County; that there was no unusual crowd in the courtroom; and that the audience contained as many colored people as white people.

To sustain the exception made, the appellants cited the cases of *State v. Jackson,* 110 S. C., 273, 96 S. E., 416; *State v. Kenny,* 77 S. C., 236, 57 S. E., 859, 861, and *State v Davis,* 138 S. C., 532, 137 S. E., 139.

In *Jackson's case,* this Court reversed the ruling of the Circuit Court, whereby a change of venue was refused. It was held that the granting or refusing of motions for change of venue is discretionary with the Court; but such discretion must be judicial, and not arbitrary. In that case, as stated in the Court's opinion, the defendant "submitted the affdavits of 20 prominent and respectable citizens of the county to the effect that it was impossible for him to get a fair and impartial trial in Jasper county on account of prejudice against him, the inflamed state of the public mind, and

the popularity and influence of the prosecutor. The State offered nothing to the contrary. * * * Upon the showing made, defendant was clearly entitled to a change of venue."

In the *Kenny case*, it was urged on appeal that the jury was prejudiced against the defendant by reason of his being accompanied by an armed guard. Our attention is called to certain language used by Chief Justice Pope, who wrote the opinion in the case, as follows: "In the modern Court room it is a rule that as little show of arms, etc., must be made as possible. In most jurisdictions handcuffs even are not allowed to be kept on the defendant during the trial. The presence of uniformed men, the display of arms, in fact anything going to create the impression that the person in custody is an unusually dangerous criminal, has its weight with the jury, and should not be allowed." Still, under the facts shown in that case, the judgment against the appellant was affirmed.

In the *Davis case*, the refusal to grant the change of venue requested was held to be error by this Court. It was shown that the homicide charged against the defendant was followed by intense excitement; that, for several days, defendant was hunted by bands of armed men; that the deceased was a man of standing in the county and very popular, and that his family connection was large and influential; that in order to prevent violence to the defendant, he was removed from the County and held as a prisoner in the State penitentiary; and that although efforts were made to employ local counsel for the defendant, no attorney in the County could be employed.

We cannot regard the expression of our late distinguished Chief Justice Pope in the *Kenny case* as a declaration of this Court, but are compelled to consider it as *obiter dicta*. At this time, we do not criticize what he did say, and we feel that the views which he gave are worthy of thoughtful consideration. It is not always to be held, however, that the presence of militia or an armed guard in the trial of a crim-

inal case is in itself sufficient evidence that ·the accused person did not receive, and could not receive, a fair and impartial trial. On the contrary, there may be instances in which a military guard would help to insure a fair trial to one charged with crime. In the *Kenny case,* this Court upheld the action of the lower Court in having an armed guard to prevent the escape of the defendant. The Court can conceive of instances where no proper protection is afforded, that honest and intelligent jurors might, because of fear of mob violence to the accused, or themselves or to other persons connected with the Court, render a verdict of guilty, even when they thought the accused was innocent; on the other hand, knowing that the accused, jurors, witnesses, and others would be properly protected by an armed force, would not hesitate to acquit the accused.

.The showing in this case for a change of venue does not in any way compare with that made in either the *Jackson* or *Davis cases.* The only thing before the trial Judge was the unsupported statement of counsel for the appellants and the presence of the soldiers. The trial Judge could see and hear what was going on in the courtroom and much of the talk of the people in and about the building. There is nothing to dispute his frank open statement that any threats against the accused persons had come from citizens of Hampton County, where the deceased, Mr. Langford, had formerly resided, and that there was no undue amount of ill will expressed against the accused by citizens of Beaufort County where the trial was held. Judge Johnson is resident Judge of the Fourteenth Circuit, which embraces Beaufort County. He possessed more information as to conditions existing at the time of this trial than the members of this Court could possibly have. It will be noted that in the *Davis case,* the defendant was absolutely unable to secure a local attorney to represent him, although he was prepared to pay a proper amount for such services. In the case at bar, the six defendants on trial together were represented by four members

of the Beaufort County Bar; one of these attorneys repre-
sented the three Francis defendants, one represented Abra-
ham Gadsden, and two other able lawyers, Col. W. J.
Thomas and his son, Hon. Calhoun Thomas, represented
Simmons and Adams, who are not appellants. The grounds
upon which the motion for a change of venue was made
were entirely insufficient, and it would be going much further
than this Court has ever gone for us to hold that there was
any abuse on the part of the trial Judge of the judicial dis-
cretion vested in him under the law.

A large number of the exceptions relate to alleged errors
on the part of the trial Judge in instructions as to the law
given by him in his charge to the jury. Several of these ex-
ceptions, namely, the thirteenth, fourteenth, seventeenth,
twentieth, twenty-first of the Francis appellants, and the
twenty-ninth and thirtieth of the appellant Gadsden, pertain
to the law of arrest, and the right to resist unlawful arrest.
The twelfth exception of the Francis appellants charges error
for refusal to give a new trial because of the right of Frank
Francis to resist arrest. The twenty-eighth exception, set up
by Gadsden, adopts the twelfth exception referred to. All
nine exceptions mentioned may be disposed of properly to-
gether. We think it will be fair in the consideration of these
exceptions, and of great assistance in making clear all the
points to be decided, to quote all of the charges of the Cir-
cuit Judge, which touch upon the subject of arrest and the
right of one to defend himself against an attempted illegal
arrest. In the general charge, the Circuit Judge instructed
the jury as follows:

"Now, in this case and for the purpose of this case, I
am the sole judge of the law. I charge you that in this case
there is no evidence that the deceased officer was making a
legal or valid arrest. In other words, I charge you that from
the evidence in this case the officer had no legal right, or
lawful right, to attempt to arrest the defendant Frank
Francis. That is so, gentlemen, for the reason that under the

law of this State, and I believe it is the law of every State in the Union, no officer can lawfully arrest a citizen for what is known as a misdemeanor without a warrant, unless the misdemeanor was committed in the presence of the officer. I will read you a very thorough statement of that law: 'An officer has no right to arrest a citizen for an offense committed out of his presence, without a warrant, and such citizen has a right to resist such arrest with whatever force is necessary, and, if the officer tries to arrest him by force, the officer is guilty of an assault.' I charge you that. (a) *In that connection I charge you this: That if the officer without a warrant arrests a citizen for an alleged infraction of one of the minor laws of the State, called a misdemeanor, without a warrant—in other words, if the officer is actually attempting or intends to make the illegal or unlawful arrest, the mere fact that the officer tells the person whom he addresses to consider yourself under arrest, or that I have a warrant for you, or something of that kind, that does not give the person addressed by the officer the right to attack the officer. In other words, the person addressed would have no right actively to resist the illegal arrest until the officer had done some overt act to arrest the person. For example, had laid his hands upon him.* In that connection, the mere fact that one stands still and just says I won't go, that is not a resistance of arrest. In that connection I also charge you this: (b) *That where an officer arrests a citizen without a warrant, and informs the citizen that he is there to arrest him, or tells him you are my prisoner, or that I have a warrant for you when he actually has not got the warrant, or, if he goes further than that and actually attempts by physical means to effect the illegal arrest, if thereafter the officer desists from his purpose, if the officer thereafter desists from his effort to make the unlawful arrest, why then the person no longer has the right to resist, there is nothing to resist, and it makes no difference what caused the officer to desist.* If the officer actually attempting to effect

or attempting to make the illegal arrest ceases in his efforts from any cause whatsoever, then the person sought to be arrested unlawfully no longer has the right to resist, and if one thereafter should slay the officer intentionally and with malice, that person would be guilty of murder. Or, if thereafter he slew him in sudden heat of passion, he would be guilty of manslaughter."

At the instance of counsel for Paul Francis and Frank Francis, the Judge charged certain written requests of those defendants. Some of the requests, as presented, were modified. There seems to be no objection to the written requests as charged. Those instructions, as given, were as follows:

"5. I charge you that even if in fact the owner of the machine (an automobile) operated it in violation of law, yet if the officer did not in fact see such violation and did not have a warrant for the arrest of the person so charged, he could not against the consent of such person effect a lawful arrest.

"6. An arrest for a misdemeanor not committed in view of the officer is unlawful without a warrant, and a person has the same right to resist an unlawful arrest as to resist an unlawful assault.

"7. The seventh I charge you with slight modifications: A person may not only take life in his own defense, but by virtue of the rule of common law he may do so also in defense of wife, parent, child, or brother-in-law. The right of mutual defense is applicable not only in cases of unlawful assault but also where the necessity for such mutual help results from a condition brought about by an attempted unlawful arrest, but one cannot go to the aid of a near relative unless and until such relative is in danger of losing his life or sustaining serious bodily harm.

"8. I will charge this: If one has reasonable grounds to believe and does believe that he is in imminent danger of death or great bodily harm at the hands of an officer making an illegal arrest and there is no other reasonably safe way to

avoid such death or bodily harm, he may kill if necessary, though as a matter of fact his life was not in actual danger. Under the doctrine of apparent danger, you must measure such apparent danger as it appeared at that time and place to a person of ordinary firmness, prudence and courage under the circumstances as then appeared to exist to the defendant. I think I have charged you this already in substance.

"9. I charge you: An officer seeking to make an arrest has no right to use more force than is reasonably necessary to subject the person to his authority, and where he goes further and uses unnecessary force the relations between the parties are the same as those between private individuals, and if the person sought to be arrested believes that he is in danger of being killed or of receiving great bodily harm he may defend himself even to taking the life of the officer; provided, that a man of ordinary firmness, prudence and courage similarly situated would have reached the same belief or conclusion.

"10. I charge you: If an arrest is unlawful, the defendant had the right not only to resist it, but it made the person or officer attempting such arrest liable for assault and battery and false arrest.

"11. The doctrine of self-defense applies as well to cases of an officer attempting to make an arrest who abuses his authority and transcends the bounds thereof by the use of unnecessary force and violence as to the case of a private individual who unlawfully uses such force and violence."

The appellant Ethel Francis submitted certain requests to charge, most of which were given as presented. Her fifth request was modified, and such modification is assigned as error in the twentieth exception. The pertinent requests of Ethel as charged were as follows:

"3. I charge you that Ethel Francis alleges that she is the wife of Frank Francis, one of the defendants in this case. She alleges that she is not guilty because she did not aid and

abet the murder of the deceased. Even should you find that she did aid and abet the murder, I charge you that she is entitled to defend her husband against an unlawful assault or felonious attack, and she stands on the same footing as her husband, and if he, Frank, was justified in the acts which he is alleged to have committed, she would likewise be justified if her acts were of the same nature and under similar surroundings."

"5. (c) *I want to change the latter part of it and make if state that principle more accurately than expressed here: I charge you first that while Ethel Francis might have been justified in defending her husband from an unlawful assault, yet if the officer was rendered helpless from injuries that right to attack the officer would no longer exist and she would lose this protection, bear in mind, that if she at that time and place was under the apprehension or impression that his life was still in danger, she could still assist him though as a matter of fact his life was no longer in danger. In other words, the law does not measure apparent fears by how they might appear to a calm person standing off from an assault, but how would it appear to an ordinary person of firmness, prudence and courage similarly situated."*

Near the conclusion of the charge, the solicitor made the following inquiry of the Court: "Did the Court charge that (d) *if the officer while he had no warrant attempted to arrest a man for a misdemeanor and without using any force, or laying hands on him, just words, would not justify the man to whom those remarks were addressed to slay the officer?"* In response, the presiding Judge said: "I have charged that." It is contended in the twenty-first exception that this was error.

All through, we have italicized the language of the presiding Judge alleged by the exceptions named hereinbefore as having declared the law erroneously; and, for convenience, we have indicated by the letters (a), (b), (c), and (d) the given instructions set forth in the exceptions under consideration.

The italicized language indicated by us under the letter "a" is alleged to be error for the following reasons: (Seventeenth exception) That the Court should have qualified this charge by stating that the display of a deadly weapon, and a peremptory order by the officer to get into the car, might well be considered as an overt act of violence, when making an unlawful arrest; that the Court should not have used the words, "for example, laid his hands upon him." (Thirteenth exception) That the instruction given was a charge on the facts; that the inference to be drawn was that the use of a pistol or the displaying of it was not an *overt* act; that the impression was made that an act of resistance is not permissible until the illegal arrest is an accomplished fact, whereas the law permits a man to prevent an unlawful arrest.

The italicized language used in our subdivision "b" is imputed error (fourteenth exception), in that it was a charge on the facts, and that it inferred there was evidence that Paul, Ethel and Frank Francis, or one or more of them, may have killed the officer after he had ceased from his attempt to arrest Frank Francis, whereas there was no evidence that either of the three persons named touched or injured the deceased after he desisted from the illegal attempt to arrest Frank Francis.

The twentieth exception alleges that the presiding Judge, in connection with the charge he gave as No. 5 of the appellant, Ethel Francis (our subdivision "c"), should have charged also, at the beginning of the altercation, if the conduct of the deceased and his associate, accompanied by the display of a deadly weapon, made the situation appear to Frank Francis that his life was in peril, or that he was in danger of serious bodily harm, although the deceased had not laid hands on him, Frank Francis would have had the right to act in self-defense..

Exception No. 21 imputes error on the part of the trial Judge in the statement made by him in response to the solicitor's inquiry (our subdivision "d"), because by making that statement the Court removed from Frank Francis his de-

fense that he was threatened with a deadly weapon, although the officer may not have laid hands on him; and it is urged the Court should have charged in that connection if either the officer or his associate had threatened Frank Francis with a deadly weapon, and Frank Francis thought his life was in danger, although the officer had not laid hands on him, he would have been justified in slaying the officer.

So far we have not attempted to recount any of the facts surrounding the homicide under investigation in the case at bar, reserving such statement and discussion thereof when we enter upon the consideration of other exceptions than those to which we have already referred. For the present, we think it sufficient to state only that the difficulty was begun when the deceased, Mr. Langford, sought to arrest the appellant Frank Francis for some alleged violation of our laws as to the operation of automobiles. There was some contention on the part of the State that the attempted arrest was legal, but as has already been seen, the presiding Judge held that the deceased did not have the right to make the arrest. For the purposes of determining this appeal, this Court regards it as the proper thing to adopt the view announced by the trial Judge.

■ Without question, it is the law of this State that an officer cannot arrest one charged with a misdemeanor, not committed in the presence of the officer, without a proper warrant for such arrest being in the actual possession of the officer at the time of making the arrest. *State v. Shaw*, 104 S. C., 359, 89 S. E., 322; *State v. Quinn*, 111 S. C., 174, 97 S. E., 62, 3 A. L. R., 1500; *State v. Randall*, 118 S. C., 158, 110 S. E., 123; *State v. Bethune*, 112 S. C., 100, 99 S. E., 753.

■ The charge of the Judge (a), to the effect that one sought to be unlawfully arrested has no right to make a physical attack upon the officer seeking to make the arrest simply because the officer tells the person sought to

be arrested to consider himself under arrest, or that he has a warrant for the person, is sustained by the cases of *State v. Seigler*, 94 S. C., 117, 77 S.E., 731, and *State v. Bethune*, 112 S. C., 100, 99 S. E., 753.

In the *Seigler case,* the Circuit Judge charged, in substance, that if an officer, with the insignia of his office in view, with the purpose of discharging his duty as he supposes it to be, with the use of no more force than necessary, sought to make the arrest, the party sought to be arrested would not be justified in shooting the officer down. This Court approved that charge in connection with other instructions given by the Judge.

In the *Bethune case,* the presiding Judge used this language: "Where one is defending his person from an unlawful arrest, he had the right to use just so much force as is apparently necessary to accomplish his deliverance and no more." The instruction given was approved by this Court.

The charge complained of must be considered with the whole charge. At the instance of the appellants, the Judge instructed the jury that a person had the right to resist an unlawful arrest, and that an officer attempting an unlawful arrest was liable for assault and battery (defendants' request. No. 10). He also charged that an officer seeking to make an arrest has no right to use more force than is necessary (request No. 9).

We do not think the appellants can complain of the use of the words, "for example, laid his hands upon him." The charge was not on the facts. Even if the language used did touch upon the facts of the case, we are inclined to the opinion that such language would have been favorable to the appellants. There was testimony on the part of the appellants to the effect that the deceased drew a pistol when he approached Frank Francis for the purpose of arresting him. If the illustration given by the Judge, of laying hands upon a person sought to be arrested by an officer, was such as to create the impression upon the minds of

the jury that a person sought to be arrested had the right to resist with sufficient force such illegal arrest, then undoubtedly, the jury must have also understood that the use, or threatened use, of a deadly weapon by the officer, under such circumstances, would have also given the person sought to be arrested the right to use such force as was necessary to prevent the officer from using the pistol to the hurt of the one sought to be arrested unlawfully. In any event, if counsel for the appellants felt that the law as declared by the Circuit Judge should have been qualified, as they now contend for, it was their duty to make proper request therefor. The record shows that the presiding Judge listened patiently to requests for instructions to the jury. He charged almost all the written requests asked for by counsel for the appellants and gave every indication that he would entertain verbal requests for instructions.

From the argument of appellants' counsel, we take it that the only objection set up against the instruction, under subdivision (b), is that the charge therein made was on the facts, as before stated, and that there is no question as to the correctness of the legal principle laid down by the Judge. Certainly, if an officer, who starts out to make an illegal arrest, desists from his purpose so to do from any cause whatsoever, and it is apparent to the one sought to be arrested, and those who are assisting him in the resistance, that the officer has ceased his efforts, and there is no danger of the illegal arrest being accomplished, it is the duty of the person sought to be arrested, and those who are assisting him therein, to also desist in any further effort to injure the officer. The *Bethune case,* hereinbefore cited, is authority for this proposition, for it must be evident when no force at all is required to prevent the illegal arrest being carried into effect, the use of any force would be a violation of law. We are of the opinion that this part of the charge complained of was applicable to the facts in the case, but that it did not give any impression on the

part of the trial Judge as to what he conceived those facts to be.

What has already been said as to subdivision "a" applies sufficiently to the twentieth exception (c).

In the absence of any further request on the part of the appellants, we think the charge complained of was a fair statement of the law. What has been said as to subdivision "b" (fourteenth exception) also answers the error imputed in the twenty-first exception (d).

In addition to the authorities before mentioned, we are satisfied that other well-recognized authorities sustain in every respect the full and fair instructions as to the law of arrest and the right to resist unlawful arrest, which were given by the presiding Judge. We quote from a few of the authorities, which we think bear out the position we take. The emphasis indicated is ours.

"An unlawful arrest, or an attempt to make an unlawful arrest, stands upon the same footing as any other nonfelonious assault, or as a common assault and battery. The person who is so unlawfully arrested, or against whom such an unlawful attempt is directed, is not bound to yield, and may resist force with force, *but he is not authorized to go beyond the line of force proportioned to the character of the assault, or he in turn becomes a wrongdoer.*" 2 A. & E. Enc. of Law, 909.

"A mere trespass on one's person or liberty is no reason for the taking of life, *and if one commits a homicide while resisting an arrest, even though it is unlawful, he cannot justify on the ground of self-defense unless he can show that the killing was apparently necessary to protect himself from death or great bodily harm.*" 25 A. & E. Enc., 279.

The last quotation from American and English Encyclopedia of Law met the approval of this Court in the opinion written by Mr. Justice Woods, in the case of *State v. Byrd,* 72 S. E., 104, 51 S. E., 542.

"* * * But such person should use no more force than is necessary to resist the unlawful arrest, and is justified in using or offering to use a deadly weapon only where he has reason to apprehend an injury greater than the mere unlawful arrest, as danger of death or great bodily harm." 21 Cyc., 804.

"It not infrequently has been reasoned that an unlawful attempt to restrain a person's liberty is such an aggression as to furnish a complete excuse for slaying the aggressor. The contention, however, has met with little or no favor in the eyes of the Courts. On the contrary, it is generally held that the slayer is not excused unless he can show that the homicidal act was done in his necessary defense. While there can be no doubt of the right of the citizen to resist an attempt illegally to restrain his freedom, yet his resistance must not be in enormous disproportion to the injury threatened. He has no right, according to the better view, to take human life to prevent a mere trespass upon his person or liberty, when unaccompanied by any imminent danger of great bodily harm or felony." 13 R. C. L., par. 170, p. 868.

It is necessary, under the law, to overrule the exceptions under consideration.

The appellants Frank, Paul, and Ethel Francis set up in their twenty-second exception that the Judge erred in the use of the following language in his general charge: "I charge you that when one goes to the aid of another in combat or conflict, the person going to the aid of the other stands in the same position, or upon the same feet, or in the same shoes, of the person to whose aid he has gone."

The appellant Gadsden, who is a brother-in-law of the appellant Frank Francis, by his thirty-second exception. also complains of error in this respect.

The quoted words are taken from the Judge's general charge concerning the right of a near relative to go to the aid of another in a difficulty. There seems to be no question

as to the other instructions given along with the language now complained of.

In this connection, we call attention to the third request to charge of the Francis appellants, given by the trial Judge, which was as follows: "I charge you that Ethel Francis alleges that she is the wife of Frank Francis, one of the defendants in this case. She alleges that she is not guilty because she did not aid and abet the murder of the deceased. Even should you find that she did aid and abet the murder, I charge you that she is entitled to defend her husband against an unlawful assault or felonious attack, and she stands on the same footing as her husband, and if he, Frank, was justified in the acts which he is alleged to have committed, she would likewise be justified if her acts were of the same nature and under similar surroundings."

The request charged should perhaps not have used the word "murder" as it was used, but the principle stated in the request was in line with, and to the same effect practically, as the instruction which it is now urged was erroneous. The charge as given by the presiding Judge, as well as the request of the appellants, which was allowed, is in entire accord with the holdings of this Court as laid down in the case of *State v. Cook,* 78 S. C., 253, 59 S. E., 862, 864, 15 L. R. A. (N. S.), 1013, 125 Am. St. Rep., 788, 13 Ann. Cas., 1051. The argument of the appellants now is to the effect that the holding in the *Cook case* was wrong. The stated principle there announced was reaffirmed in *State v. Brown,* 108 S. C., 490, 95 S. E., 61, and *State v. Shuler,* 116 S. C., 152, 107 S. E., 147.

It was conceded by the counsel for the appellant in the case of *State v. Hays,* 121 S. C., 163, 113 S. E., 362, that the declaration of the law as laid down in the *Cook case* was the settled law of this jurisdiction, and that it was recognized with approval in the case of the *State v. Brown; supra.* In the *Hays case,* at the request of counsel for the appellant, the Court granted permission to review the law as declared

in *State v. Cook*. In the opinion therein, this Court reaffirmed the conclusion announced in the *Cook case,* and approved the following language of Mr. Justice Woods: "We have endeavored to show the law as laid down by the Circuit Judge is firmly established. It is true the rule may in exceptional cases work hardship; but the opposite rule would allow the innocent man who had been forced to strike in self-defense to be killed with impunity, merely because appearances happened to be against him at the moment a partisan of his antagonist reached the scene of conflict. The duty seems urgent to enforce rather than relax the rule which admits of no excuse for taking human life except necessity."

Exceptions 22 and 32 are overruled.

The attorneys for the Francis appellants argue their fifteenth, sixteenth, eighteenth, and nineteenth exceptions together. We shall dispose of these and the thirty-first and thirty-third exceptions of the appellant Gadsden which are identical with the fifteenth exception of the other appellants, at the same time. These exceptions relate to the charge of the presiding Judge upon the law of concurring and participating by overt acts in the commission of a homicide. Counsel for the appellants very properly conceded that if there was any evidence of any concert of action, the instructions given would not be objectionable. The two main contentions as to the law announced by the Circuit Judge in the exceptions under consideration are: First, that the legal principles declared to the jury were not applicable; and, second, that the language of the Judge was in violation of the constitutional provision, which prohibits Judges from charging on the facts. In a way, it appears to us that the two theories of the appellants are inconsistent, for if there was no evidence which made the law as declared applicable to the case, then it is difficult for it to be held that the instructions of the Judge in any way unduly touched upon the facts as they were adduced in the testimony. It is maintained also that some of the instructions, referred to in the exceptions now

before us, declared the law of conspiracy, when the law of that subject was not involved, and when the State did not contend that any two or more of the defendants on trial had conspired to murder the deceased.

The instructions of the trial Judge, alleged to have been erroneous, were as follows:

Fifteenth and eighteenth exceptions: "That all persons who are present concurring and participating by some overt act in the commission of a murder, or a felonious homicide accompanied by malice, are participating therein, and the act which causes such murder, or such felonious homicide with malice, is regarded in the law as the act of each and all so present participating, aiding, abetting, counseling and concurring."

Sixteenth and nineteenth exceptions: "In that connection, it need not be shown that there was actual verbal agreement to stand by and aid the one or the other, but before a man can be convicted as a principal on the theory that he was an aider or abettor, the jury must be satisfied that he was present, and that he was actually aiding and abetting by some overt act in the commission of the homicide. In that connection, I charge you further and by way of illustration, for example, you and I without speaking a word, might by look or by action indicate one to the other that we were backing the one or the other, and that we were acting in concert. In that connection, I charge you that if in this case there is any evidence that would justify this against either or any of them is wholly a question of fact for you, and I do not intend to intimate any opinion whatsoever. I just want you to understand the law."

The charge complained of in the fifteenth and eighteenth exceptions is well supported by the authorities of this State since the case of *State v. Anthony,* 1 McCord (12 S. C. L.), 285. In that case, Mr. Justice Nott said this: "Where several are engaged in committing a murder, it is not material which gave the mortal blow; for where one is charged with having

given a mortal blow, and others as having been present, aiding and assisting, and it comes out in evidence that he who is charged with having given the mortal wound was only present aiding and abetting, and that the stroke was given by another, the indictment is well supported; for it is in law the stroke of all."

In the case of *State v. Jeffords,* 121 S. C., 443, 114 S. E., 415, 416, Mr. Justice Fraser, speaking for the Court, quoted with approval some language from the case of *State v. Jenkins,* 14 Rich. (48 S. C. L.), 215, 94 Am. Dec. 132, as follows: "All who are present concurring in a murder are principals therein, and the death, and the act which caused it, is, in law, the act of each and of all. There is no distinction in the regard of the law, in the degrees of their guilt, or the measure of their punishment, or the nature of their offense, founded upon the nearness or remoteness of their personal agency respectively. An indictment charging it as the act of a particular individual of the party will be well sustained by evidence that any other of them gave the fatal stroke, or that it was given by some one of them, though it does not appear by which."

The language of the presiding Judge complained of by the appellants in the sixteenth and nineteenth exceptions was taken practically verbatim from the case of *State v. Hunter,* 77 S. C., 119, 57 S. E., 637, and in that case it met the approval of this Court.

We do not find in the charge of the presiding Judge any expression which may be regarded as a charge on the law of conspiracy; the charge was full and correct as to the law of aiders and abettors. The instructions alleged to have been inapplicable did not meet the theory of the appellants, but they were responsive to the contentions of the State.

The exceptions referred to are held to be without merit.

The fourth and fifth exceptions allege error on the part of the trial Judge in failing to direct a verdict of not guilty as to the appellants, and especially in not directing the jury

that in no event could the appellants, or either of them, be convicted of murder, as the highest offense established, if any offense at all was proved, was that of manslaughter. The remaining exceptions, the sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, twenty-third, twenty-fourth, twenty-fifth, twenty-sixth, twenty-seventh, and thirty-fourth, relate to the refusal to grant a new trial in the case. All these exceptions will be disposed of together.

Quite a number of these exceptions contain strong arguments in favor of the innocence of the appellants as to any crime charged against them, and these arguments urge with considerable force that in any event the appellants should not have been convicted of a higher crime than that of manslaughter. It is exceedingly difficult to select from the exceptions the real assignments of error. As best we can, however, and with as much brevity as is possible, with the view of covering all the contentions of the appellants, we undertake what we conceive to be a fair statement of their positions, which are as follows: That the deceased officer, Mr. Langford, had no right to attempt, under the circumstances, the arrest of the appellant Frank Francis, and that the conduct of the deceased and Mr. McDaniel, who was along with him, amounted to an aggravated assault upon Frank, giving to him the right to use considerable force to save him from the attempted arrest and the injury threatened; that Paul Francis, as father of Frank, and Ethel, as Frank's wife, and Gadsden, as his brother-in-law, had the right to assist their relative in preventing the unlawful arrest and saving him from physical hurts apparent at the time; that neither of the appellants did more than was necessary at the time of the difficulty to carry out their lawful purposes; that the evidence against the appellants was largely circumstantial and inconsistent with their guilt; that the proof showed not more than one, and certainly not more than two, persons were guilty of inflicting the fatal injury of the deceased, and that it was unjust to convict four or more persons of inflicting

such fatal injury; that the evidence failed entirely to support the verdict rendered, and the guilt of the appellants beyond a reasonable doubt was not established.

In the consideration of the exceptions, we must keep in mind the legal principles already declared, and it will be proper to refer hereafter to some other principles not heretofore mentioned. It will be necessary, too, to recount some of the facts shown in the testimony. The motions for directed verdict were made at the close of the testimony for the State. A motion of this character comes properly at the close of all the testimony in a case, and it will be proper, therefore, to consider all the testimony in passing upon the errors charged.

Two legal principles, so well established that it is unnecessary to cite authority in their support, are these: (1) The ruling of a trial Judge in refusing to grant a motion for a directed verdict should not be interfered with, if there was any evidence on the issues in the case which required the submission of the question at issue to the jury; and (2) the failure of a trial Judge to grant a new trial for lack of testimony to support a verdict of the jury should not be reversed if there was any evidence at all upon which the verdict could be based.

From the evidence adduced, it appears to be undisputed that, on the morning of the day on which Mr. Langford was killed, the appellants Frank and Ethel Francis, who resided in the city of Savannah, Ga., accompanied by Robert Adams (a convicted defendant, who is not appealing), Stepney Glover, and others, came from Savannah to attend a baseball game and other festivities of the colored people to be held at a place near Mitchell's shop in Beaufort County. The parties traveled by automobile, and somewhere on the road, in all probability in Beaufort County, other travelers complained of the manner in which Frank Francis was driving his car. There was no South Carolina or Georgia license tag displayed on Frank's car, but he did have a license tag of the city of Savannah, and he claimed that his

Georgia tag had been recently lost or stolen. In the vicinity of the gathering, which they were to attend, the party visited at the homes of Abraham Gadsden and Paul Francis. A little later all the appellants, with Adams, Glover, and others, went to the baseball game. Late in the afternoon, the deceased, Mr. Langford, a rural policeman of Beaufort County, and Mr. W. A. McDaniel, game warden of that county, with common-law powers as a peace officer, went to the gathering of the colored people. For some reason, doubtless because the testimony was not properly competent, it is not clear what information Mr. Langford had received, or from whom it came, as to improper conduct, if any, on the part of Frank Francis in the driving of his automobile in Beaufort County; but it is evident that Mr. Langford had received some information which caused him to go to the place of the baseball game and search for the driver of a certain automobile. At the time Langford and McDaniel reached Mitchell's shop, there were gathered some 200 or more colored people; many were on the baseball field, and a number were in the hall where refreshments were being sold. Langford and McDaniel found the automobile of Frank Francis. Langford searched it and inquired of some negro women, who were about the place, as to who was the owner of the car. Within a very short time, Frank Francis appeared and acknowledged that the car under the observation of the officers was owned by him, and it seems that some of the negro women to whom Langford had talked had informed Frank that inquiry was being made as to the car.

While there may be some little question as to Langford having a warrant of arrest in his possession, to our minds the testimony showed that he did not have such warrant, and if he did have a warrant of any kind, it could not have named Frank Francis as the person to be arrested.

From the time of the appearance of Frank Francis at the automobile, where Langford and McDaniel already were, there is great conflict in the testimony as to the occurrences.

Not only is much of the testimony of witnesses for the prosecution flatly contradicted by witnesses for the defendants, but some of the testimony of State's witnesses is disputed by other witnesses for the State, and the testimony of many witnesses for the defendants is greatly at variance with statements of other witnesses for them.

It is not required, in passing upon the exceptions now being considered, to point out testimony favorable to the defense of the appellants. In fairness to them, however, we shall briefly, review some of the things they endeavored to show by their own testimony and that of witnesses favorable to them.

The best statement from the appellants' viewpoint as to the beginning of the difficulty comes, perhaps, from Frank Francis. In substance, he testified as follows: That about 5 o'clock in the afternoon he left the baseball diamond to go to the hall, and saw two white men (evidently, Langford and McDaniel, whom he did not know), but he paid no attention to them; he had a baseball bat with him, although he had nothing to do with the baseball team. He put the bat in the hall. He saw one of the white men pick up the cushion from the back seat of his car. He inquired what was the trouble, and was asked to whom the car belonged, and he responded that it was his. His testimony, as reported, was then as follows: "I asked them what was the trouble. After I asked them what was the trouble, they asked who this car belonged to. They say, this your car? I said yes. They said, we want you. I said for what Chief. He said you were coming from Savannah this morning recklessly driving. I said I was not driving reckless. He said, did you not like to run two gentlemen into the ditch on the highway. About that time one of them made the remark, shut up your darned mouth. I did not pay much attention. At the same time one of them stepped around. When they said that and stepped around like that, this man I was talking to snatched his pistol out too and knocked me in the head. I thought he

was to try and shoot me and I tried to catch him. After we catched hold together, this man shot me (indicating Mc-Daniel) and. I fell. The lick knocked out my sense. I did not come to myself until I heard several pistols shooting."

He stated further he felt a shot and could not move after he was shot; that after some struggling he leaned up by the side of the hall; that he did not know Mr. Langford was a rural policeman; that he was not able to stand up or lean against his automobile after he was shot; that he did not see Ethel Francis from the time he was shot until the whole thing was over; that he had no pistol; that he knew nothing about Mr. Langford getting shot, hit, or kicked; that Langford hit him over the right eye; that he did not see his father or any of the other appellants or Joe Williams (an accused, who escaped) when the shooting was going on.

The testimony of the appellant Paul Francis was to this effect: As he came from the baseball diamond, he first saw Messrs. Langford and McDaniel and his son Frank near an automobile. He heard the dispute they had concerning reckless driving. He started up where the others were and took his gun, one of .32 caliber, from an automobile and placed it in his pocket "as he thought somebody was going to steal it," and had it when he approached Langford and his son. Mr. Langford and Frank were clinched, and Langford was hitting Frank with a pistol. Just as he got close to the car, McDaniel pulled his gun and shot Frank, whereupon Paul ran around the car and shot at McDaniel; McDaniel returned the fire at Paul; he pursued McDaniel for a little while, and then returned to the place where he had left Langford and his son; that he was sure that neither of. his shots hit either his son or Mr. Langford, and that he did not shoot in the direction of these two. He could only identify four shots, one that McDaniel fired at Frank, one that McDaniel fired at himself, and two that he had fired at McDaniel, although he testified there were many other shots fired; that his son Frank did not have any pistol; that he saw Abraham Gadsden near the

difficulty, but that he did not see Gadsden do any shooting, or have any pistol; that Stepney Glover had a gun in his hands, but he did not see him shoot; he saw Sam Simmons, but did not see him do anything, and that he did not see Robert Adams during the difficulty. When he returned to the place of the difficulty from his pursuit of McDaniel, both Langford and Frank were down on the ground, but he did not know who shot Mr. Langford.

The appellant Ethel Francis testified briefly, as follows: That she went to the hall in a car with Robert Adams, and was not accompanied by her husband, Frank, and that she proceeded to help prepare ice cream for sale. Frank was in the hall when she arrived, but he soon went out to the base-ball game. She and her sister-in-law, Katherine Gadsden, wife of the appellant Gadsden, went to the window; then Ethel went outside. Mr. Langford and Mr. McDaniel were out at the car at that time. Gadsden and Frank came back to the hall together, and Katherine told Ethel that Mr. Langford and Mr. McDaniel, officers, whom Ethel did not know, were out there. Katherine told Ethel that the officers had asked her whose car that was, and that she had told them that it belonged to Frank. Thereupon, Ethel told Frank to go out there. She heard Frank and the officers talking, but did not know what they were saying. She went out on the porch. Mr. McDaniel was at the back of the car and Mr. Langford was near, and Frank was resting his arm on the car. She inquired what was the matter, and Frank says, "For speeding." She told him to go ahead. "Mr. Langford took a pistol and said 'nigger, I don't want no arguing out of you,' and they clinched. Just as they clinched, Paul Francis came from the front of the car and shot twice." Ethel then turned to go back to the hall. Some woman, one Rosa, called her to get Frank, who was then on the ground. Frank told her that his leg was broken, and asked her to get some one to put him in the car. About that time, Abraham Gadsden stood up in the door, and Joe Williams was standing

near him, and Gadsden shot Langford from the back and Joe Williams shot him from the front. Frank was then sitting in the car. Robert, Frank, and Ethel drove off down the road a little piece, and Paul Francis got into the same car. Witness was positive that Mr. Langford struck Frank Francis before Paul shot, but she could not say whether or not Paul saw Langford with a pistol, as Paul came running up from the side before he fired. Ethel denied shooting, cutting, or biting Mr. Langford, or giving Frank a pistol during the affray, or engaging in the difficulty in any way whatsoever. She did not see Robert Adams or Sam Simmons take any part. As she saw it, one of the two shots fired by Paul Francis hit and wounded Frank. She heard Paul say, as they were driving away, "he had done a good fight, and he would die and go to hell for his son." She did not see Mr. McDaniel fire his pistol.

The substance of the testimony of the appellant Gadsden was as follows: He drove up in his car to the hall from the baseball diamond and met Langford and McDaniel. In a little while, he heard them say that they had a warrant for Frank Francis. Frank inquired for what, and one of the men told him to get into the car. Frank said what for, but did not get into the car. He heard a pistol shoot. When he looked around, he saw Frank grab Langford and shoot him, and Paul Francis came around and shot Langford in the back. Stepney Glover ran up and cut Langford in the back, and he also had a black pistol in his hand. Joe Williams ran around there, but he did not know what Joe did. Sam Simmons hit Langford with a knife. Robert Adams kicked Langford. Gadsden said Ethel Francis was not in the difficulty, being at the window of the hall when he saw her. He denied having any part in the fight, and said he did not have a pistol and did not own one. He also testified that he did not see Mr. Langford pull a pistol or hit Frank Francis with one. He denied hearing his wife talking to Ethel as to the officers being out at the car. The first shot fired, accord-

ing to him, was by Frank Francis, and the next shot was from the pistol of Paul Francis.This appellant was arrested on the day following the homicide on his way to Savannah, but he insisted that he was not trying to make his escape. He admitted that he had told Mr. McTeer in the Beaufort jail that he was not present when the shooting of Mr. Langford took place, having falsified, as he explained, because he was afraid.

Sam Simmons, one of the defendants convicted of manslaughter, who is not appealing, testified about this : He came up to the scene of the difficulty, evidently after the fighting had started, and saw people running. A woman advised him that it would be better not go "yonder," but he said he had nothing to do with it, he was not fighting, and "they can do nothing to me to go and look." He saw Mr. Langford lying on the ground with his head toward the porch and one arm doubled up. About that time, a white man came up in his car and jumped out. He did not know {Mr. Langford, but was told who he was. He endeavored to make Mr. Langford comfortable. When advised to leave, he said: "I was not going, because the Sheriff is liable to come and I will stay as he might not know who might have done it." He stayed until the white folks came and was arrested. He denied having any part in the difficulty and knew little about it, but he did see Paul Francis running down the road with a pistol in his hand. Said he had taken a little whisky that day, but was not drunk.

Robert Adams, sentenced to life imprisonment, who did not appeal, made substantially the following statement : That he came from Savannah to the baseball game to take part therein; that he was playing on third base when the shooting commenced; he heard several shots and saw a white man running, who was pursued by Paul Francis; that he went toward the hall, and, while going, he heard several shots; then he saw a white man stretched out on the ground and Frank Francis was in a Buick automobile, lying on the back seat.

He saw Joe Williams shoot Mr. Langford while the latter was on the ground. Ethel Francis called him, and asked him to drive Frank's car to Savannah to take him to a hospital. He heard Abraham Gadsden call to Missie (his wife), "Let's get into the car and go home." He did not see Ethel do anything, and she had no knife. He denied having any part whatever in the difficulty, or that he had a baseball bat. Leaving the scene of the trouble in the automobile, he heard Paul Francis say, "that he was going with his son; that he would die and go to hell with his son, and that he had made a good fight."

The chief witness, as to the beginning of the difficulty, on the part of the state was Mr. W. A. McDaniel, the game warden who accompanied the deceased to the place of difficulty and had a part therein. Mr. McDaniel testified about as follows: Mr. Langford and he, on their way from the Cumbahee river to Beaufort, arrived at Mitchell's shop about 5:30 p. m. There a baseball game was in progress, and a large number of colored men and women were around the house or hall. Mr. Langford got out of his car and went up to a large Buick touring car, and the latter had no state license of any kind on it, but it carried a city of Savannah tag. He inquired of a woman who was the owner, but she did not know. Another woman stated also that she did not know, but said she would go get the owner. As a result of the questions, Frank Francis soon came up. Langford told Frank to consider himself under arrest for not having a state license tag on his car, and Langford also placed him under arrest for driving a car without a license. Frank asked again what he was under arrest for. McDaniel told Frank, "Mr. Langford has told you what you were under arrest for and get in the car." About that time Frank grabbed Mr. Langford with his left hand up about the collar, and Langford pulled his pistol from his pocket and hit Frank over the right eye. Langford had not touched Frank Francis and made no attempt to arrest him, except to tell him that he was under ar-

rest, until Frank grabbed hold of Langford. McDaniel ran around the car next to the road, and at that time Paul Francis came from around a little store building and shot Langford in the back twice. Langford fell to his knees and then Mc-Daniel with his derringer pistol shot at Frank. The witness was not sure that he hit Frank, but admitted that he was close enough to hit him; that he shot in Frank's direction, and shot with the purpose of hitting him. While Langford, McDaniel and Frank were standing there, Robert Adams and some other person got out of a sedan and went to the base-ball ground. McDaniel went around the car for the purpose of seeing if he could help Langford out, when he was pur-sued by at least three people, and among these he recognized Robert Adams, Paul Francis, and Abraham Gadsden, each of whom shot at him. Seeing that he could do nothing on account of the danger he was in, he left the place to go for assistance. He did not see Langford shoot, and did not know what became of Langford's pistol, which was missing when the difficulty was over. He saw four or five people pile on Langford. Paul Francis shot Langford in the back twice. Around twenty bullets were fired. Witness did not know if Langford had a warrant. He saw Sam Simmons on Lang-ford. When he returned with some assistance, and after telephoning to Ridgeland for the officers there to look out for Langford's assailants, he returned to the place of the dif-ficulty and found Langford still breathing, but he died in a very short while.

J. E. Drawdy, who was sworn as a witness for the defend-ant Paul Francis, corroborated to a great extent the testi-mony of Mr. McDaniel as to the beginning of the difficulty. The witness saw but little. On his way from Whale Creek to Beaufort, he stopped for just a few moments, as he ex-pressed it, to watch the ball players pick up a ball. He did not know any of the parties engaged in the affray, but was able to identify Frank Francis as one of them. He saw no white man with a pistol, but he heard a white man command Frank

Francis to get in a car. At the time the white man was standing on the ground and Frank Francis was standing on the porch of the hall. Witness cranked his car and was preparing to leave, but he saw Frank Francis grab the white man by the shirt or shoulder, and then saw the white man hit Frank with his pistol. As the witness passed on, he saw colored people, whom he did not know, with guns, and heard shooting.

Stepney Glover, one of the main witnesses for the prosecution, supported very strongly the statement of Frank Francis as to the starting of the affray, but in many instances he supported the contentions of the State. He denied that he participated in any way in the difficulty. He related that there was some complaint that morning by white people along the road as to the manner in which Frank Francis was driving his automobile. After Mr. Langford inquired as to the ownership of the Buick car, Frank Francis came up with a baseball bat in his hand and stood on the porch. He then got down and leaned on his car. Mr. Langford was looking in the car, and Frank inquired of him what he was looking for. Langford inquired as to whose car it was, and Frank told him that it was his. Mr. Langford walked around in front and told Frank "to put himself under arrest. Frank say, what for. After Frank say for what, he jumped up then and told Frank for reckless driving and speeding and to get on in here, and caught his hand and shoved Frank like that. He had his pistol like that and struck him side of head like that and told him to get in. Then Frank went into him and closed in on him and they went down on the ground and started fighting. When they came up somebody shot him (presumably Frank) I could not tell. I think it was this other white fellow. After he shot, they started running in and his father then ran up and shot him (Langford)." Witness further related that somebody asked where was Frank's pistol, and that Ethel Francis ran back into the hall and came out with a pistol and handed it to Frank, and that Frank then shot

Langford twice. That Robert Adams was down on Langford and was hitting him with a bat. Abraham Gadsden ran out of the shop with a long black pistol in his hand and shot at McDaniel. Sam Simmons was there and had a knife. After Langford was down on the ground, "they were all on him beating him, I could not tell what they were doing, they were mixed up on him. Paul Francis struck him in the head with the pistol butt after he was on the ground." He did not know what became of Mr. Langford's pistol, but denied the insinuations of appellants' counsel that he had taken it. He saw Ethel Francis bite him (Langford).

Richard Washington, who was playing baseball, swore that he saw Frank Francis and a little later Abraham Gadsden going to the hall, and about 10 minutes later they got to the hall he heard shooting. He then went to the hall and saw Langford down on his hands and knees, and he saw Paul Francis shooting at Mr. McDaniel, who was running. Robert Adams was there with a bat and hitting Langford. Sam Simmons cut Langford with a knife. When he saw Abraham Gadsden, that appellant was going to his automobile. He did not see either Frank Francis or Ethel Francis with a pistol, and so far as he could see, Ethel had no part in the affair.

The appellants Paul, Frank, and Ethel Francis, and Robert Adams, a few hours after the killing, were arrested by Sheriff Langford of Jasper County, as they were on their way to Savannah, and lodged in the jail at Ridgeland. Frank Francis explained his wounded condition to Sheriff Langford by telling him, so the Sheriff testified, that he had been in an automobile wreck. A. G. Thomas, a white man who was confined as a prisoner in the Jasper County jail, testified as to a conversation he overheard had by Paul and Ethel Francis and Robert Adams. According to Thomas, Paul said, "Well, we done the killing and it is over with and that's that; the boy on the cot (Frank) that was the one that did it, we will let the blame rest on him." Ethel said that she did all she could do, "I bit him and I cut him with a knife." Robert Adams

said, "We did the best we could and it is a pity we did not get the other man."

Dr. H. Clay Foster, who examined the deceased, was the main witness for the state as to the wounds received by Mr. Langford. Dr. Foster reached the deceased within a few minutes after he died. He was also offered, as mentioned hereinbefore, as a witness for the defense. This Court has been much impressed by the testimony given by Dr. Foster, for it appears that the witness is not only a man of high intelligence and a physician and surgeon of more than ordinary ability, but that he gave every indication of desiring to be absolutely fair in the statements he made. In brief, Dr. Foster testified that the deceased was very bloody, that his skull was crushed like an egg shell, there was a knife stab wound below the collar bone on the right side, a deep knife wound down to the breast bone, two bullet wounds in the back, two bullet wounds in hands, six distinct bites from human teeth on the left arm from the shoulder to the elbow, abrasions of the scalp from either hits or kicks, and powder burns from the pistol on the back and neck; and that the shirt of the deceased was burned. The wound on the skull was made by some blunt instrument, he said, and could have been done with a baseball bat. In the opinion of Dr. Foster, at least one of the bullet wounds, the two knife wounds and the lick on the skull, all or either of them, were sufficient to cause the death of Mr. Langford.

Messrs. H. E. Wallace and C. R. Straussbaugh testified as to reaching the scene of the difficulty after the fighting was all over, and that they found Mr. Langford still living, but that he died within a little while and before Dr. Foster came. These gentlemen saw none of the defendants around the place where the homicide was committed with the exception of Sam Simmons. Mr. Wallace said that Simmons was about half drunk. Mr. Straussbaugh testified that he heard Simmons say to Isaac Mitchell, a colored man who was there, "be careful what you tell him."

It is our opinion that the testimony to which we have called attention is wholly sufficient to justify the conclusions we have reached in determining the exceptions now under consideration, and it is not necessary to go into the testimony of any other witnesses in the case. The record is voluminous, consisting of 275 typewritten pages, and in many instances the typewriting is difficult to read. The Court has read, read, and reread all the testimony, but, as suggested hereinbefore, we have deemed it the proper thing under the law, to read it as favorable as we can to the theories of the State, for the reason that it is not within the province of the Court to pass upon the facts in issue, or to give any opinion as to the credibility of the witnesses. These matters were entirely for the jury. This Court is only concerned with ascertaining if there was error on the part of the Circuit Judge, under the law, in refusing to direct a verdict as requested by the defendants, or if he committed error in refusing their motion for a new trial.

That the appellants may have their positions placed fairly in the record here, and for the purpose of calling attention to other legal principles not hereinbefore adverted to, which we think are of considerable importance in this case, we are setting out in full the twenty-sixth and twenty-seventh exceptions on the appeal. These are as follows:

"Twenty-sixth. The verdict was without evidence to sustain it as to any particular one of the appellants and should be set aside for the reason that only two possibly fatal bullets entered the deceased and both, according to the undisputed evidence, were fired from point blank range, from the same direction, on almost the same spot, and of the same calibre, whereas the undisputed evidence is that the pistol fired by Paul Francis was of small calibre, and those fired by Abraham Gadsden and Joe Williams were of larger calibre, and it was within the power of the State to produce the bullets which killed the deceased and thus establish the innocence of the one or more whose pistols were of different calibre

and this was not done so that the verdict was of necessity based upon conjecture although the best evidence could have been produced. Wherefore, in the interests of fairness and justice a new trial is demanded by the State's failure to make definite and certain the party firing the fatal shots."

"Twenty-seventh (Exception of Gadsden). The human eye being incapable of following the flight of a pistol bullet and the evidence as to who fired the fatal shots, both of which were fired by the same person, as shown by the shirt, and testified to by the doctor, being purely circumstantial and inconsistent with the guilt of more than one defendant, and three having been convicted of firing the fatal shot to wit: Paul Francis, Frank Francis and Abraham Gadsden, while three having been convicted of firing the fatal shot, to wit: Joe Williams, emptied his pistol one round at point blank range at the deceased while he lay upon the ground, the circumstantial evidence not only fails to establish the guilt of this defendant but fails to exclude the reasonable hypothesis that the fatal bullets were fired by one of two defendants, Joe Williams, who is a fugitive from justice or Paul Francis, or Frank Francis, and therefore the verdict against this defendant is without evidence to support it and the Court erred in refusing to direct a verdict of acquittal as to this defendant on motion."

As suggested before, these exceptions are rather argumentative. They present, however, in a very clear manner, some of the main contentions of the appellants, and they were earnestly argued by able counsel at the hearing of the cause. This Court cannot say which of the wounds received by the deceased caused his death, nor can it say which of the wounds contributed to that death. Under the testimony of Dr. Foster, at least four of the wounds were sufficient to produce death. If either was sufficient to produce death, then that wound in all likelihood also had some effect in hastening the death of the deceased. And, too, some of the wounds not described by the physician as death wounds may

have contributed in some way to the bringing about of the death of Mr. Langford. All these matters under our law were clearly for the determination of the jury. Without further comment on our part, we deem it only necessary to quote from some authorities of high standing certain well-announced legal principles, of which we approve, and which we regard as being applicable to the facts of the case at bar, and which authorities, in addition to those already cited, sustain the action of the presiding Judge in submitting the ·case to the jury on both the issues of murder and manslaughter, and which support also his refusal to grant a new trial. We italicize certain language to which we direct especial attention.

> *"One who inflicts an injury on another is deemed by the law to. be guilty of homicide if the injury contributes mediately or immediately to the death of such other.* The fact that other causes contribute to the death does not relieve the actor of responsibility. So the physical condition of the slain man at the time when the act was done, will not excuse or minimize its consequences, if the casual connection between it and the fact of death is made to appear. On the other hand, if an injury is merely a condition which does not contribute to produce death, the law does not hold the actor criminally responsible. *Accordingly, if one wound is inflicted while acting in self-defense, and another after the deceased had declined all further combat and was fleeing from the defendant, and each wound was sufficient to have produced death, he may be adjudged guilty of murder in inflicting the last wound if it contributed to the death, though had it not been inflicted the deceased would have died from the wound given by the defendant while acting in necessary self-defense.* If, however, the latter wound did not contribute to the death of the decedent, then he is not guilty of any degree of homicide. The fact that an injury, followed by death, was subsequent and nearer in point of the time thereto than injuries received from other sources, is not to

be taken as the criterion for determining responsibility. *If two persons inflict wounds on another at different times, and the first aggravated by the second produces death, he who inflicted it will be held responsible; but if the later injury produces death, and the first although it is the occasion of the second, does not contribute to death, the law fixes responsibility on him who dealt the subsequent blow. If at the moment of death it can be said that both injuries were contributing thereto, the responsibility rests on both of the actors.* The law does not measure the effects of the several injuries in order to determine which is the more serious and which contributed in the greater measure to bring about the death. Although one of the assailants may be said to have contributed to death in a less degree than the other, he is not for that reason deemed to be less guilty or less punishable. *So one of two persons who cause the death of another by shooting is guilty of homicide if the wound inflicted by him contributed to or hastened the death, although alone it might not have been fatal.*" 13 R. C. L. par. 53, p. 748.

"But though a human body must be alive in order that it may be the subject of homicide, yet the quantity of vitality which it retains at the moment the fatal blow is given, and the length of time life would otherwise have continued, are immaterial considerations. *If any life at all is left in the human body, even the least spark, the extinguishment of it is as much homicide as the killing of the most vital being.* 21 A. & E. Ency. of Law (2d Ed.), p. 92.

"In regard to homicide, it is now a well-established rule of the common law, frequently affirmed by statute, that where one or more persons are actually or constructively present when a homicide is committed by another, and either having a criminal intent of their own or sharing the criminal intent of him who commits the crime, in any manner aid, abet, or encourage him in accomplishing his purpose, all such participants are principals in the crime and equally guilty with

the actual perpetrator thereof. *In legal contemplation the act of one is the act of all, it is wholly immaterial which one of the participants actually strikes the fatal blow."* 21 A. & E. Ency. of Law (2d Ed.), p. 110.

"One is not legally responsible for a homicide unless his unlawful act, or unlawful omission to discharge a duty which he owed to deceased, contributed to the death of the victim, *and conversely, one may be guilty who inflicts additional wounds which hasten the death of one already mortally wounded."* 29 C. J., 1078.

All the exceptions that impute legal error for the failure of the presiding Judge to grant a directed verdict on the whole case, or as to the charge of murder alone, and the refusal to grant a new trial, are overruled.

We have read the opinion of Mr. Justice Cothran in this case carefully a number of times, and in connection therewith we have gone over again thoroughly the transcript of record. For some reasons, readily apparent, we would like to agree with him as to the result he proposes. The difficulty we have in doing so, however, is due to the fact that in his discussion of the case he has adopted practically all the theories of the defendants, and has accepted as being true the testimony favorable to them. And almost every authority cited by our learned brother to sustain the legal principles advanced by him is taken from cases decided by Courts other than our own, which are not altogether in line, as we see it, with the decided cases of this Court.

We think it not out of place to once again call attention to the fact that in criminal cases, even in those where men have been sentenced to death, this Court, under the Constitution of this State, is absolutely limited to the correction of errors of law. Excepting only when we must examine into the facts for the sole purpose of ascertaining if there has been error of law in the Court below, this Court has nothing whatever to do with the facts in the case.

The responsibility in this most serious cause, so far as this Court is concerned, rests only as to the legal errors charged by the appellants to have occurred in the lower Court. Arduous and repeated examinations of the record have failed to disclose any error as complained of by the appellants.

The ascertainment of the truth of the grave charges made against the appellants rested in the Court of General Sessions of Beaufort County, with the witnesses, the petit jury, and the presiding Judge. The great power to grant the defendants a new trial on the ground that the verdict rendered against them was unjust as to the facts, or not supported by the evidence, vested alone in the trial Judge; it is not with this Court. The duty of finding out the truth from the evidence was imposed upon the jurors, who had taken a solemn oath to perform that duty regardless of fear or favor. The prime duty in effecting a just determination as to the guilt or innocence of the defendants, and the grade of that guilt, if any, lay upon the minds and consciences of the witnesses; for, after all, trial Judges of great ability, who are entirely impartial, and jurors of high intelligence and wide experience in human affairs, seeking only the truth, may be misled into error by witnesses who endeavor to conceal that truth.

If there has been, or is to be, a miscarriage of justice in the case at bar, the blame must be borne, as we see it, not by any Judge or juror, but by those witnesses, white and black, who made sworn statements against the interest of the appellants as to the occurrences in the unfortunate difficulty, in which an officer of the law lost his life. Judges often, and jurors, too, in a grave situation like unto the one in this case, may find some little comfort from the thoughts and language of that righteous and just Judge, Hon. George Williams Gage, who, in refusing the motion for a new trial to a man convicted of murder, said: "Whether this verdict is right depends on the testimony of the witness McFadden. I don't know him but the jury does. If he told the truth, it is right;

if he told what is not the truth, he will have to answer for it before his Maker when he comes to die. Whether or not he told the truth is a matter for the jury, and they have accepted his testimony. The whole case rests upon McFadden's testimony." *State v. Bethune,* 104 S. C., 353, 89 S. E., 153.

The dissenting opinion of Mr. Justice Cothran, and the most earnest arguments of counsel for the appellants in this case, have impressed us much as appeals for clemency, especially as to the defendants who have been sentenced to die. Under the law of our State, however, the granting of mercy in a homicide case rests with the jury of twelve men who are to render the verdict; after that verdict has been rendered, clemency to the one to whom the jury has refused to extend mercy is a matter for the serious consideration of the Chief Executive of the State. The people of South Carolina have not charged this Court with the dispensing of either mercy or clemency.

It is the judgment of this Court that the judgment of the Court of General Sessions of Beaufort County as to all the appellants, be and the same is hereby, affirmed.

MESSRS. JUSTICES STABLER and CARTER concur.

MR. CHIEF JUSTICE WATTS did not participate.

MR. JUSTICE COTHRAN (dissenting) : The defendants Paul Francis, Frank Francis, Ethel Francis, and Abraham Gadsden, with two others, Sam Simmons and Robert Adams, all colored, were indicted in the Court of General Sessions for Beaufort County, charged with the murder of a white man, E. L. Langford, a rural police officer of Beaufort Court, on June 6, 1927, at a country precinct in said county.

The trial was begun on June 30th. 24 days after the alleged homicide, at Beaufort, before his Honor, Judge Johnson, and a jury, and lasted three days.

The verdict was :

Paul Francis : Guilty of murder *without* recommendation to mercy.

Frank Francis: The same.

. Abraham Gadsden: The same.

Ethel Francis (wife of Frank Francis) : Guilty of murder *with* recommendation to mercy.

Robert Adams: The same.

Sam Simmons: Guilty of manslaughter.

Motions for new trials were overruled and sentences imposed according to law.

The defendants Sam Simmons and Robert Adams have not appealed from the judgment and sentences of the Court; the other four, Paul Francis, Frank Francis, Ethel Francis, and Abraham Gadsden, have.

The evidence tended to establish the following facts, a condensed statement of which appears to be necessary for an apprehension of the legal issues involved in the appeal:

The homicide occurred at a locality known as Mitchell's Store, about six miles from the City of Beaufort; there were gathered there on June 6, 1927, some 200 or 300 colored people; a game of baseball was in progress upon grounds on the opposite side of the highway from the store, and several hundred yards away; the storeroom had been converted temporarily into a hall where refreshments were being served by the colored women; the storeroom had a porch at the front, the edge of which was quite near the highway.

It appears that the defendants Frank Francis, Ethel Francis, and Robert Adams lived in Savannah; Paul Francis, father of Frank, Abraham Gadsden, a brother-in-law of Frank, and Sam Simmons, lived in Beaufort County, not far from the store.

On the morning of the homicide, the Francis defendants other than Paul Francis, and Adams, in different automobiles, left Savannah with others for the gathering, and reached it some time after noon, parking their cars near the store and highway; the car of Frank Francis being about seven feet from the porch of the store.

While the ball game was in progress, Frank Francis left the field and returned to the hall. In the meantime the deceased Langford and one McDaniel, a game warden, arrived upon the scene and parked their car near the hall. They began to search the car of Frank Francis, inquiring whose car it was. Frank Francis came out of the hall, on the porch, and inquired what was the trouble. Langford asked him, "Is this your car?" Francis said that it was. Langford said: "We want you. You are under arrest. Get in the car." Francis asked: "What you want me for, Chief, I ain't done nothing." Whereupon Langford again commanded him to get in the car, and again Francis asked him what it was for. Upon being told that he was wanted for driving recklessly, Francis in a peaceful manner was explaining to the officer that he had not done anything to cause his arrest.

At this point, McDaniel broke into the conference and said, "He had already told you what he wanted you for, and God damn it, get in that car." Whereupon Langford drew his pistol and struck Francis over the left eye, stunning him. Upon the display of the officer's pistol, and being struck with it, he grappled with the officer. At this moment, McDaniel fired at close range, point blank, at Francis with a 44-caliber derringer, breaking the thigh bone at the hip, whereupon Francis and Langford fell to the ground, and four or five negroes piled upon and attacked him.

The autopsy upon the body of Langford showed that he had been shot twice in the back, stabbed twice in the breast, shot once in the hand and once in the arm, had been struck above the temple with a blunt instrument which crushed his skull "like an egg shell," had bruises from blows upon his person, and his arm had been bitten in several places.

The testimony is confused and contradictory as to whether the wounds, other than those in his hand and arm, were inflicted while he was on the ground in the initial stage of the mêlée. It appears that he arose, walked to the edge of the porch, and sat down.

There was testimony to the effect that, while he and Frank Francis were struggling, Paul Francis ran up with a pistol and shot him twice in the back.

There was testimony also that in the struggle, Ethel Francis, his wife, handed a pistol to Frank Francis, and that he, standing face to face with Langford, shot him twice, although the autopsy disclosed no wounds in the front of his body.

There was testimony also to the effect that, while he was sitting at the edge of the porch, Abraham Gadsden and Joe Williams each fired a full round into his back, and that he "slumped" off the porch onto ground.

There is nothing to show when or by whom the crushing blow upon his temple was delivered. From the testimony of the doctor that either the wounds in the back or the blow on the head were fatal, it appears most probable that they were inflicted while he was seated on the edge of the porch; for with such fatal wounds he could hardly have moved from the original point of the struggle to the porch.

Paul Francis, father of Frank, admitted that when he saw his son clubbed over the head with a pistol by Langford, and shot by McDaniel, he fired twice at Langford; one bullet entered his hand and arm and the other the leg of his son Frank, about an inch from the point of exit of the bullet fired by McDaniel.

After Langford had arisen and seated himself upon the edge of the porch, Frank Francis, still upon the ground with a shattered thigh, called for help in getting into his car and being carried to a doctor.

Langford lived only a few minutes after the mêlée, dying upon the ground where he had fallen from the porch.

It is extremely important to observe that the mêlée consisted of two distinct and separate stages: The initial struggle between Langford and Frank Francis followed by the conduct of the other participants at that point, and the attack

upon Langford after he had sat upon the edge of the porch. Whatever excuse Frank Francis, or Paul Francis, or Ethel Francis may have had for the counter attack in defense of Frank Francis, who was being clubbed by one and shot by the other of the officers, that stage of the mêlée had passed when Langford sat upon the porch in a wounded condition; he was not then making an attack or attempting an unlawful arrest, and his assailants at that point had no possible excuse for their attack. It is not contended that either Frank, who was upon the ground, or his father, Paul, or his wife, Ethel, had any part in that second stage.

After Langford had "slumped" from the porch to the ground, under the attack with pistols of possibly Gadsden and Williams (a fugitive, not on trial) and of the wielder of supposedly a baseball bat, not one of the 200 negroes remained except the defendant Sam Simmons, who is not appealing, and another not implicated. Frank Francis was placed in the automobile, the negro, Adams, driving, and after moving off from the hall they picked up Paul, and the party were on the way to Savannah, when they were arrested at Ridgeland. They were indicted and brought to trial on the 30th day of June at Beaufort.

The scene of the trial: The courthouse grounds and courtroom were under control of the State militia; no person was permitted to enter the Court without being searched; the prisoners were brought from jail to the courtroom under military guard marching behind, in front, and on both sides; they were escorted under such guard throughout the trial; were under military guard in the court room, and during the noon and night recesses were escorted by the military through the grounds and back to the jail, which was kept under military guard during the whole trial, night and day.

Frank Francis had received the shot which broke his thigh on June 6th. He had been bedridden, flat on his back, with his leg and side in a bulky mechanical contrivance. He was confined in jail on a cot and brought to and from the court-

room on a truck, lifted from the truck and carried by men up the stairs and into the courtroom, and back to the jail in the same manner.

The trial lasted for three days, being concluded about midnight of the third day.

The defendants were not charged with conspiracy to take the life of the deceased. The occurrence appears to have been one of those sudden tragic outbursts which come without warning and without possibility of preconcerted action.

The defense interposed in behalf of Frank Francis was that he was an innocent victim of an unlawful search and unlawful arrest, and of the conduct of McDaniel, who began the catastrophe with a shot from his derringer; that Frank had never, at any time, had a weapon and could not have used one upon the deceased if he had had one; that even if he had shot, cut, or clubbed Langford, he would have been doing so under the fears of a reasonable man in defending his person and life from the assault of two white men, both armed with deadly weapons.

The defense of Paul Francis was that if he did actually shoot at Langford and McDaniel, he did so in defense of his son after having seen his son struck with a revolver and shot down with a pistol, and had seen him fall to the ground in the embrace of Officer Langford. The defense of Ethel Francis was that she was an innocent victim of time and place, had nothing to do with the matter, had used no weapon of any kind, but, even if she had, she would have been acting in the defense of her husband's life and person.

The defense of Abraham Gadsden was that he had used no weapon at all, but, even if he had, it would have been in defense of the life and person of his brother-in-law, Frank Francis.

Robert Adams and Sam Simmons were entirely disconnected by family ties or interest with the Francis group and had nothing to do with them. They were mere volunteers without connection of any kind with the Francis family.

When the case was called for trial, the defendants Frank Francis, Paul Francis, and Ethel Francis, the wife of Frank, moved for a severance as between them and the other defendants, Abraham Gadsden, Sam Simmons, and Robert Adams, upon the grounds that their defense was self-defense, different from that interposed by the other defendants, and that it was inevitable that certain evidence, admissible against the other defendants but inadmissible against them, would be offered, and that notwithstanding the admonition of the Court that it could not be used against them, the effect was unavoidable to seriously prejudice them.

The defendant Frank Francis moved for a continuance of the case, as against him, upon the ground that his physical condition seriously impaired his ability, mentally and physically, to properly present his defense.

All of the defendants made a motion for a change of venue upon the ground of local excitement and prejudice against them under the circumstances.

The motions were all refused by the presiding Judge.

At the close of the evidence the defendants moved for directed verdicts in their favor, upon the ground that the evidence failed to connect them in a guilty manner with the offense charged. This was also refused.

The high points in this deplorable tragedy and trial, concededly, are these:

(a) The deceased, a rural policeman who should have known better, began the trouble by attempting to search the automobile of the defendant Frank Francis without a search warrant, and to arrest him without a warrant, and without having been an eyewitness to his alleged violation of law, a misdemeanor.

(b) Upon his insistence that the defendant Frank Francis enter the automobile, obviously for the purpose of carrying him to a Magistrate, and the reluctance and protest of Frank, the deceased and his companion, McDaniel, a game warden,

angrily ordered him into the car; the deceased drew his pistol
and struck the defendant Frank over the head a severe blow,
and McDaniel placed a .44 derringer against the defendant's
thigh, and fired, shattering the bone.

(c) The defendant Frank then grappled with the deceased,
and they both went to the ground; at this point the mêlée be-
came general; the testimony is confused and conflicting.

(d) In the mêlée Paul Francis, the father of Frank, see-
ing his son attacked by two men, each with a pistol, one of
which had been used to strike Frank and the other to shoot
him, ran up and fired twice; one ball entered the groin
of his son, and the other the hand and arm of the deceased.

(e) The defendant Frank was on the ground with a broken
leg and a shot in the groin, calling to be helped into the car
and carried to a doctor.

(f) The deceased walked a few steps and sat down upon
the porch of the store or lodge in which refreshments
were being sold; the autopsy showed that he had been shot
twice in the back, stabbed twice in the breast, and had been
struck over the head with some blunt instrument, supposedly
a baseball bat, and his skull crushed "like an egg shell";
wounds which must have been inflicted after he sat down
upon the edge of the porch, as he could hardly have moved
after they were inflicted.

(g) The evidence tends to show that while thus seated on
the porch, one of the defendants, Abraham Gadsden, and
another, Joe Williams, now a fugitive, emptied their guns
into his body, and some one struck him with a baseball bat.

(h) The homicide occurred on June 6th, and on June
30th, 24 days later, the trial began. In the meantime the
defendants, other than Frank Francis, were removed to the
penitentiary for safety; Frank was lodged in jail, as he could
not be transported in his wounded condition; some kind of
a mechanical contrivance, of a nature not explained, was
applied to his broken leg. When the trial was to begin, Frank
was lifted into a truck and carried to the Courthouse. He

was placed upon a cot in the courtroom, where he lay upon his back for three days of the trial in which his life was at stake.

(i) Doubtless due to the apprehension of a lynching, a military guard surrounded the jail day and night, accompanied the defendants from the jail to the courtroom and back, and were on guard in the courtroom during the trial.

The points in the case which will be discussed are:

1. The exercise of a sound discretion would have demanded and justified a severance of the defendants as between Frank Francis, Paul Francis, and Ethel Francis, on the one part, and the defendants Abraham Gadsden, Sam Simmons, and Robert Adams, on the other.

2. The exercise of a sound discretion would have demanded and justified a continuance of the case as against the defendant Frank Francis, on account of his physical condition.

3. Conceding the truth of the testimony most strongly against the defendant Frank Francis, as evidence it was legally insufficient to sustain a verdict of guilty of murder.

4. Conceding the truth of the testimony most strongly against the defendant Paul Francis, as evidence it was legally insufficient to sustain a verdict of guilty of murder.

5. Conceding the truth of the testimony most strongly against the defendant Ethel Francis, as evidence it was legally insufficient to sustain a verdict of guilty of murder.

6. The case as against the defendant Abraham Gadsden.

7. The charge of the presiding Judge.

I. *The exercise of a sound discretion would have demanded and justified a severance of the defendants, as between Frank Francis, Paul Francis, and Ethel Francis, on the one part, and the defendants Abraham Gadsden, Sam Simmons, and Robert Adams, on the other.*

It has been held in numberless cases that a motion for severance "is addressed to the *sound* discretion of the trial

Judge," and that his decision will not be disturbed except upon a clear showing of an abuse of that discretion. By the very terms of the announced principle, the decision is not final and conclusive, pretermitting a review of it; it may be reviewed and will be reversed if the appellate Court should conclude that there has been an abuse of that discretion.

As former Circuit Judge Benet, acting Associate Justice in the case of *Norris v. Clinkscales,* 47 S. C., 488, 25 S. E., 797, 801, observes: "And the appeal will lie, not because of any so-called 'abuse of discretion,'—a phrase unhappily framed, because implying a bad motive or wrong purpose— but because his ruling may appear to have been made on grounds and for reasons clearly untenable. This principle is recognized in *Trumbo v. Finley,* 18 S. C., 315, where Mr. Justice McGowan says that the exercise of a Judge's discretion, 'as a rule, will not be disturbed unless it deprives a party of substantial right, which he can show he is entitled to under the law.' "

Which means that this Court should review circumstances and grounds of the motion, and if it should come to the clear conclusion that the motion should, in the interest of justice and fairness, have been granted, the refusal will constitute an "abuse of discretion," a "phrase unhappily framed," without the slightest imputation of a bad motive or wrong purpose on the part of the Circuit Judge, and with no other criticism than that which follows any other error of law. The softer form of expressing the rule would have been that, unless it should appear otherwise, it will be presumed on appeal that the discretion was soundly exercised.

"This Court adopts without dissent as the correct rule on this subject, that where two or more are charged in the same indictment with a capital offence, they have not a *right* by law to be tried separately, but such separate trial is a matter of sound discretion to be exercised with all due regard and tenderness to prisoners, according to the known humanity of our criminal jurisprudence." *State v. Wise,* 7 Rich., 412.

This clearly shows that the exercise of the power by the trial Court is not absolute; it does not justify the appellate Court in relying upon the decision of the trial Judge without an inquiry into the circumstances of the case and the grounds of the motion, as if the exercise of his discretion had foreclosed all inquiry into its justness.

. As the Georgia Court said in *Caldwell v. State,* 34 Ga:, 10: "We do not say it is an unbridled, uncontrollable discretion; but where severance is demanded as a right, unsupported by cause shown, and refused, we are wholly indisposed to interfere with the exercise of the discretion."

In the later case of *Horne v. State,* 37 Ga., 80, 93, 92 Am. Dec., 49, the Georgia Court held: "But as a general rule we hold that in all cases where parties are indicted for an offense which does not require the joint act of two or more to constitute the offense, the defendants upon application have a right to be tried separately; the rule is otherwise in those cases which require the concurrence of two or more in their commission; in cases of this class the matter is subject to the legal discretion of the Court before whom the trial takes place."

·This Court has not gone so far; but has held that in both classes of cases, the matter is one for exercise of the sound discretion of the trial Judge. That issue is necessarily open' upon a consideration of the circumstances and grounds.. ·

In *Isbell v. U. S.* (C. C. A.), 26 F. (2d), 24, 25, the Court, while announcing the general rule that motions for severance rest in the sound discretion of the trial Judge, said: "Nothing appears in the record which would indicate that the trial Court abused this discretion in denying the motion, *or that the facts in this case present a situation from which it might be apparent that either defendant could not or did not secure a fair and impartial trial by being tried jointly with his co-defendant."*

So in *Raarup v. U. S.* (C. C. A.), 23 F. (2d), 547, 548, the Court held that the motion was properly refused, in that

"the record does not show that Raarup would be or was prejudiced by a denial of his motion for a severance."

Discretion of Court relative to granting separate trial is not arbitrary. *People v. Sweetin,* 325 Ill., 245, 156 N. E., 354, 357.

"While granting of a separate trial of defendants jointly indicted rests in discretion of trial Court, Court must exercise a sound discretion in overruling such a motion." *People v. Rupert,* 316 Ill., 38, 146 N. E., 456.

"Where from the nature of the case it appears that a joint trial will probably be prejudicial to the rights of one or more of the parties, a separate trial should be granted when properly requested." *State v. Brauneis,* 84 Conn., 222, 79 A., 70, 72.

"The controlling question is whether it appears that a joint trial will probably result in substantial injustice." *State v. Castelli,* 92 Conn., 58, 101 A., 476, 478.

"While, whether a separate trial shall be allowed parties jointly indicted, is within the discretion of the Court, where, from the nature of the case, it appears that a joint trial will probably be prejudicial to the rights of one or more of the parties, a separate trial should be granted when properly requested." *State v. Brauneis,* 84 Conn., 222, 79 A., 70.

There are several circumstances in this case which demonstrate the inevitable prejudice to the moving defendants of a joint trial:

1. A white man, an officer of the law, had been killed at a negro gathering under circumstances of great brutality.

2. The trial was being had swift upon the heels of the event, when public sentiment was so aroused that, in the opinion of the Circuit Judge, it was necessary that the military be called out by the Governor to protect the defendants from an outburst of resentment; it was evitable that upon the trial this resentment would be visited against all who were in any manner connected with the mêlée in which the officer

was killed, regardless of any justification or excuse which they might offer.

3. It does not appear to have been realized that the mêlée consisted of two separate and distinct stages; the initial encounter between Frank Francis and the officers, and the assassination of Langford after he had abandoned the conflict with Frank Francis and had sat upon the edge of the porch wounded and bloody. These stages were as separate and distinct as if Langford had been waylaid and assassinated on his way home. However excusable the Francis defendants may have been in the initial stage of the mêlée, it was practically impossible to insulate them from the effect of the harrowing recital of a subsequent cold-blooded assassination with which they were not at all connected. There was no warning by the presiding Judge against this inevitable effect.

The failure of the presiding Judge to appreciate the fact that there were two distinct and separate stages of the mêlée, and the prejudice to the moving defendants of linking them up with the events of the second stage, is developed clearly in the following extract from the Judge's charge: "That if after the officer has with force attempted to effect an illegal arrest he desists from his purpose, if the officer thereafter desists from his purpose to make the unlawful arrest, why then the person (manifestly referring to Frank Francis, the person sought to be arrested), no longer has the right to resist, there is nothing to resist, and it makes no difference what caused the officer to desist. If the officer actually attempting to effect or attempting to make the illegal arrest ceases in his efforts from any cause whatsoever, *then the person sought to be arrested* unlawfully no longer has the right to resist, and if *one* thereafter should slay the officer intentionally and with malice, that person would be guilty of murder."

There was not a particle of evidence in the case that Frank Francis, "the person sought to be arrested," lying on the ground with a shattered thigh and a wound in his groin, and calling for help to be put into his car, made the slightest

effort to harm the officer after he desisted from his unlawful attempt; this suggestion, hypothetically stated, should not have been made unless there had been some evidence along this line; its inevitable effect was to connect Frank Francis with the events of the second stage and to hold him responsible therefor.

While the charge was applicable to Gadsden, Williams, and Simmons, who, the evidence tends to show, participated in the second stage of the mêlée, it had no application to the Francis defendants; it confused the issues in the minds of the jury, authorizing them to conclude that the acts of these strangers, who shot and cut after the struggle was over, would be imputable to the three Francis people, and that they could be held responsible for the acts of strangers who plunged in after the struggle was over.

4. The defense of Frank Francis was self-defense; that of his father and wife, that they acted in defense of Frank, who was being clubbed and shot by the officers, admittedly acting in the excess of their authority. They were entitled to be tried upon these defenses, uninfluenced by what occurred in the second stage of the mêlée. They were also entitled to rely upon the defense that the homicide was committed by those who shot the deceased in the back while he sat upon the porch. To this extent their defense was antagonistic to the defense of Gadsden and Williams (if he had been apprehended). It is universally held that where the defenses of defendants. jointly charged are antagonistic, a severance should be ordered.

In *Roach v. State,* 5 Cold. (Tenn.), 39, the Court held: "Where two persons are indicted jointly, and upon being arraigned ask for a severance, if it appears that their defences are antagonistic, a severance should be granted."

When two persons are indicted and their defenses are antagonistic and the confessions of each incriminate the other and are designed to be used in evidence a severance should be granted. *State v. Desroche,* 47 La. Ann., 651, 17 So., 209.

"Where two persons were indicted jointly for murder, and there was evidence tending to show that one of them had made a confession which implicated both, it was held that separate trials ought to be granted, if such evidence was to be offered." *Com. v. James,* 99 Mass., 438.

"Antagonistic defences calculated to prejudice one of several defendants jointly accused will move the discretion of the Court to grant that one a separate trial (*U. S. v. Merchant,* 12 Wheat., 480, 6 L. Ed., 700; *U. S. v. Ball,* 163 U. S., 672, 16 S. Ct., 1192, 41 L. Ed., 300)." *U. S. v. Noble* (D. C.), 294 F., 689, 691.

"Where defendants' interests are antagonistic, or evidence, incompetent and prejudicial against one, is to be introduced against another, denial of severance is error, requiring reversal, unless record shows lack of injury." *Suarez v. State,* 95 Fla., 42, 115 So., 519.

5. The joint trial deprived the Francis defendants of their full right of challenges. While this of itself would not entitle them to a severance, it adds some weight to the other considerations suggesting the expediency of a severance.

6. The state knew when the trial began that the declarations of Ethel Francis, made to the detective Rogers, would be introduced in evidence. They affected Gadsden, Paul Francis, and Frank. They should not have been admitted at all, as they were but the declarations of one defendant, not admitting her guilt, and, while made in the presence of Paul Francis and Gadsden, they were made under circumstances which did not call for a response from either; as the detective testified, "They were all, I presume, under the impression that as long as one was talking the others did not have a right to say anything," and that Gadsden shook his head. The presiding Judge very properly instructed the jury to disregard the statements attributed to Ethel, so far as they affected Frank Francis, but the damage had been done; it was practically an impossibility to eradicate the impression that had been made upon the minds of the jurors.

In *Horne v. State,* 37 Ga., 80, 93, 92 Am. Dec., 49, it is said: "We all from our experience know how difficult it is to have a fair trial when several parties are on trial and they are introduced as witnesses for each other. * * * Besides the confusion of several issues being passed upon at the same time by the same jury, affecting the lives of several persons, and some of those persons on the stand as witnesses, is not likely to enable the jury to do full and impartial justice to each defendant. * * * It originates from complicating too many issues to be decided at once. The humanity of the law did not intend to deprive three men of their lives by a trial thus confusedly conducted. The Court should have granted their motion to sever on their trials, and then the attention of the Court, counsel and jury could have been fixed upon the party on trial; and justice would much more likely be attained in this manner than by the course pursued on the trial."

In *Hale v. U. S.* (C. C. A.), 25 F. (2d), 430, 438, the Court said: "It is necessary, therefore, to determine whether the confession of Ramsey as introduced was necessarily prejudicial to plaintiff in error, and whether, in view of the fact that its introduction was anticipated, the motion for severance should have been granted. The connection of Hale with the crime rested almost entirely upon the testimony of Burkhart, himself a confessed criminal, and a man of bad general character. It is debatable whether the conviction of Hale would have resulted from his testimony in the absence of the strong corroboration contained in the Ramsey confession, but concededly the confession of Ramsey was incompetent to bind Hale. The Court so stated when it was admitted, and again in its charge; but it is inconceivable that the impression made upon the minds of the jurors could have been removed by these formal remarks of the Court."

In *Flamme v. State,* 171 Wis., 501, 177 N. W., 596, 598, the Court said: "The Court in receiving the confession of Mabel Banker properly held it was not competent evidence

against Flamme and so instructed the jury. Yet in the very nature of the evidence, if it was considered proof of the guilt of Mabel Banker of the offence charged against her, then it inevitably followed that it proved the offence charged against Flamme. We can conceive of no mental process by which the jurors could do otherwise than so regard it, and thus necessarily prove the offence of Flamme. This clearly presents a case where the confession of a defendant, admissible against her, but not against a co-defendant, must inevitably operate to the prejudice of the latter defendant's rights. Under these conditions a denial to grant separate trials is clearly an abuse of discretion."

In *People v. Sweetin,* 325 Ill., 245, 156 N. E., 354, 357, the Court said: "While it is generally a matter of discretion with the Court as to whether a separate trial shall be granted, such discretion is not arbitrary, but should be so exercised as to prevent injustice, wherever possible. While the Court instructed the jury that Hight's confessions were not admissible as against plaintiff in error, such instruction could by no possibility eradicate the testimony from the minds of the jury. While theoretically the instruction withdrew the evidence from the consideration of the jury, practically the human mind is so constructed that inevitably the prejudicial effect remained therein. [Citing cases.] To obviate the evils arising from the possibility of the jury being misled by the confessions of a co-defendant, the rule is general that, where one of several defendants jointly indicted has made admissions or confessions implicating others, a severance should be ordered, unless the attorney for the State declares that such admissions or confessions will not be offered in evidence on the trial. Some of the cases have stated that, on the plainest principles of justice, if the prosecutor intends to use such confession, the prisoner shall be tried separately. [Citing many cases.]"

7. In practically all of the cases in which the Court has declined to order a severance, the offenses charged arose out

of the same criminal act. The case at bar presents a different situation. The evidence does not tend to show that any act of the Francis defendants would have resulted fatally to Langford, or that they had any connection whatever with the homicidal act of Gadsden and Williams after Langford had sat upon the edge of the porch. The joinder of all of the defendants threw into "hotchpot" all that happened in the two separate stages of the mêlée. The Francis defendants were being tried for what happened in the first stage, and the other defendants for what happened in the second; separate and distinct offenses. It was but natural, under the Judge's charge, for the jury to conclude that if Frank Francis was to blame in the initial stage, he was responsible for all that thereafter occurred.

II. *The exercise of a sound discretion would have demanded and justified a continuance of the case as against the defendant Frank Francis.*

The undisputed fact is that he was beaten over the head by the officer Langford and knocked to the ground in a helpless condition; that his thigh was shattered by a bullet from Mc-Daniel's .44 derringer held close to his body; that he was on the ground begging to be put into his car and carried to a doctor. The evidence does not show that his request was granted or what medical attention he received. He was carried, not to a hospital; but to a jail, where some kind of a rude mechanical contrivance was applied to his fracture; 24 days later he was lifted at the jail into a truck, carted to the Courthouse, and placed upon a cot, where he lay in the courtroom for three days battling for his life.

If there ever was a time when he needed every ounce of physical and mental energy he ever possessed, it was then, in an unfriendly atmosphere.

It does not require the professional intelligence of a physician to appreciate, as Dr. Foster testified, that a man with a shattered thigh, flat on his back for more than three weeks, suffering from shock and great pain, accompanied by

the mental anxiety, which appears to have been well founded, as to his trial, would be in no condition to pass through the ordeal of a three days' battle for his life.

While motions for continuance are normally addressed to the sound discretion of the presiding Judge, when it appears that no other conclusion is reasonably justified under the circumstances than that the defendant should not have been pressed to trial, it must be concluded that the discretion of the trial Judge was not soundly exercised.

In the case of *Sacra v. Com.* (Ky.), 96 S. W., 858, the syllabus is: "Accused, with others, were indicted for rape on May 23d, the day after the crime was charged to have been committed, and on that day were taken to another place for safe-keeping. On May 31st the cases were called for trial, and accused moved for a change of venue for prejudice of the inhabitants, which was denied, but a continuance was granted until July. A jury having been obtained, the Court adjourned for Independence Day, when the jail where accused was incarcerated was entered by a mob. Accused fled in the darkness, but while in the jail yard he was shot in the face with a shot gun, inflicting slight injuries and later was shot by a squad of police with a pistol, the bullet passing through the trunk near the hip. Accused was brought into Court on a stretcher on the 6th, when he asked for a continuance because of his inability to proceed, which was denied. Held, that the denial of such application was erroneous, and entitled accused to a new trial."

The Court in its opinion (123 Ky., 578, 96 S. W., 858, 860) said: "A man on trial for his life should not be compelled to try when there is doubt about his ability to properly conduct his defense."

III. *Conceding the truth of the testimony most strongly against the defendant Frank Francis, as evidence it was legally insufficient to sustain a verdict of guilty of murder.*

The rule in cases involving the life of a defendant should not be harsher than that applied to cases involving money

or property. In those cases it has frequently been decided that the scintilla rule is unjust, and that, where from the evidence no other reasonable inference can be drawn than that the defendant or the plaintiff should prevail, the Court will grant either a motion for a nonsuit or for a directed verdict, as a conclusion of law.

The testimony in its strongest light against the defendant Frank Francis was to the effect that when he was told that he was under arrest, and directed to get into the car, he grabbed Langford by the coat collar, resisting the attempted arrest, and that after he had been struck over the head by Langford with his pistol and shot by McDaniel, his wife handed him a pistol, and that standing face to face with Langford he shot him twice. This last was the testimony solely of the negro Stepney Glover, which is incredible from the fact that there were no bullet wounds in the front of Langford's body. McDaniel does not confirm this testimony. He testified that as soon as Frank Francis caught hold of Langford's collar, Langford reached for his pistol and struck Frank with it over his left eye; that then *Paul Francis* shot Langford in the back twice, and that he (McDaniel) shot Frank with his .44 derringer; that Paul Francis then began shooting at him, and "subsequent proceedings interested him no more."

It is indisputable that Langford started the trouble by attempting to arrest Frank without a warrant, and that McDaniel was actively co-operating with him in his unlawful attempt. Certainly catching the coat collar of Langford could not be considered excessive force on the part of Frank in resisting such combined unlawful act. That is all that Frank is shown to have done except to struggle with Langford to prevent further battery. Beyond the incredible testimony of Glover, contradicted by the testimony of McDaniel and by the autopsy, there is not a particle of evidence tending to show that Frank did otherwise than to defend himself from the admittedly unwarranted combination of Langford and

McDaniel. After Langford had been roughly handled by the other negroes sympathizing with Frank, he arose and sat upon the porch, where he received the bullets in his back and the blow upon the temple from some unknown assailants. In the meantime Frank was on the ground begging to be lifted into his car and carried to the doctor. It is inconceivable that under these circumstances Frank could be held guilty of murder and sentenced to die.

According to the testimony of McDaniel, Frank had done nothing to Langford, or to him, but to grab Langford by the collar, a mild resistance to the combined efforts of Langford and McDaniel with pistols to unlawfully arrest him. It was then that Langford drew his ready gun and proposed to subdue the man who was acting clearly within his rights. If Frank had shot and killed Langford under these circumstances, no jury should have convicted him even of manslaughter. To complete the unlawful subjugation, McDaniel brought his trusty .44 into action, as he declares because Paul had fired two bullets into Langford. Why shoot Frank, who was not trying to shoot Langford, instead of Paul, who was?

IV. *Conceding the truth of the testimony most strongly against the defendant Paul Francis, as evidence it was legally insufficient to sustain a verdict of guilty of murder.*

According to McDaniel, when Langford struck Frank, Paul ran around the corner of the house and fired twice at Langford. If Langford was committing an unlawful act upon Frank and was attacking him with a deadly weapon, McDaniel standing by co-operating, Paul as the father of Frank had the same right to defend Frank that Frank had and could not be convicted of murder if his bullets had proved fatal, of which there is no evidence. On the contrary, the fatal wounds were either the stab wounds, the author of which is unknown, the bullets of Gadsden and Williams, or the crushing of Langford's skull while he sat on the porch having abandoned the conflict.

*V. Conceding the truth of the testimony most strongly against the defendant Ethel Francis, as evidence it was legally insufficient to sustain a verdict of guilty of murder.*

One witness (Glover) testified that Ethel Francis handed Frank his pistol, and that he shot Langford twice. Assuming the truth of this statement, for the reasons stated in connection with Frank's conviction, and of Paul's participation, Ethel would be protected by the defense which Frank had the right to make.

*VI. The case as against the defendant Abraham Gadsden.*

There was evidence tending to show that after Langford abandoned the conflict and sat upon the porch, Gadsden and Williams emptied their pistols into his back. This was after the initial stage, and Gadsden could not plead that he was acting in defense of his brother-in-law, Frank. At the same time there is evidence that the participation by Gadsden in the mêlée was limited to the first stage and that what he did was in defense of Frank Francis. The errors pointed out in connection with the Francis defendants would inure to the benefit of Gadsden.

*VII. The charge of the presiding Judge.*

The charge complained of, as set forth in exceptions 13, 14, 17, 20, 21, of the Francis defendants, was clearly prejudicial to their interest.

Take the thirteenth exception, for instance. The charge was: "If the officer is actually or intends to make the illegal or unlawful arrest, the mere fact that the officer tells the one he addresses to consider yourself under arrest or that I have a warrant for you or something of that kind, that does not give the person addressed by the officer the right to attack the officer, in other words the person addressed would have no right to actively resist the illegal arrest until the officer had done some overt act to arrest the person; for example had laid his hands upon him." The error being: (a) That under the circumstances of this case it was a charge on the facts; (b) that the inference to be drawn was that the use

of a pistol or display of it was not an "overt act"; (c) that active resistance is not permissible until the illegal arrest is an accomplished fact, although after it is an accomplished fact he may lawfully attempt to escape under the guise of resistance, whereas the law permits a man to prevent an unlawful arrest.

The charge was inapplicable to the facts as the state showed; it was for that reason erroneous. *Holmes v. Weinheimer*, 66 S. C., 18, 44 S. E., 82; *Hyland v. Tel. Co.*, 70 S. C., 315, 49 S. E., 879.

The defendant Frank Francis was not under indictment for resisting an officer; he was charged with killing him, of which there is not a particle of evidence. Accepting the version of the affair given by McDaniel, all that Frank had done, up to the time Langford drew his gun, was to grab him by the coat collar, which certainly was a warranted resistance to an arrest unlawfully, concededly, attempted, and so ruled by the presiding Judge. When the gun was drawn, even before it was used as a club, the question of resisting arrest passed out of the case and the right of self-defense arose.

The judgment of this Court should be that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for new trials as to all of the appellants, with direction that a severance as between the Francis defendants and the other defendants be ordered.

I have this to say in conclusion, paraphrasing the thought of Lord Shaw of Dunfermline to some extent: The defendants are all of an inferior race; the reins of government and all the instrumentalities of the administration of justice are in the hands of the superior and dominant race; there is laid upon that race the burden of unusual care in administering the principles of jurisprudence, "the marshaled search for justice." Every human judgment is mingled with human error, and in the arbitrament of the greatest of all issues, the issue of life and death, judgment of irrevocable doom (so far as judicial procedure is concerned) should not be passed except with an absolute and abiding confidence in its justness.

## Order on Petition for Rehearing

*Per Curiam:* The appellant Abraham Gadsden, within the required time, filed a petition for a rehearing of this cause. No petition was filed in behalf of the other appellants. For the purpose of protecting any right of any of the appellants, this Court, by order duly filed, directed that the petition for the appellant Gadsden should also be considered as a petition in behalf of the other appellants, and stayed the sending down of the remittitur as to all the appellants.

In the petition for rehearing, two matters were called to the attention of the Court. The first is that in the opinion written for a majority of the Court by Associate Justice Blease, the statement was made that the witness McDaniel testified that the appellant Gadsden shot the deceased, Mr. Langford. The attention of the Court is called to the fact that this statement was erroneous, and a careful examination of the record so discloses. The Court regrets this error. The record in the case, as before stated, was badly gotten up, and this, perhaps, contributed to the error into which the Court fell. We do not see, however, how the error referred to can have any effect upon the decision of the Court. Even without the incorrect statement as to the testimony of Mr. McDaniel, there was sufficient evidence, already referred to, to require the case against the appellant Gadsden to be submitted by the trial Judge to the jury. In fact, it does not appear in the petition for rehearing that it is contended that this error had any real effect in the cause.

The other matter referred to in the petition relates to the admission by the trial Judge of testimony on the part of witnesses W. W. Rogers and J. W. Gill, as to alleged statements made by the appellant Ethel Francis in the presence of the appellant Gadsden; the witnesses Rogers and Gill testifying that Ethel Francis told them, in the presence of Gadsden, that Gadsden shot Mr. Langford during the difficulty in which Mr. Langford's life was taken.

This testimony was objected to by the appellants, but the trial Judge overruled the objection. Counsel for the appellant Gadsden thinks that the decision of the Court in the case of *The State v. Hester*, 137 S. C., 145, 134 S. E., 885, is authority to sustain their position that the testimony was incompetent. We are unable to agree with that view for two reasons: First, the witness Rogers testified that Gadsden shook his head, apparently in contradiction of the statement of Ethel Francis. In addition, the Circuit Judge repeatedly warned the jury that no statement by the defendants, except on the witness stand, implicating any other defendant, was binding in any way on such other defendant. In view of all the circumstances, we cannot hold that the ruling of the Court in the *Hester case* is applicable here, and we are unable to find any reversible error as contended for.

Because of the earnestness of the counsel for the appellant, Alfred Wallace, Jr., Esq., we have gone thoroughly into the record in this case, and have given it every possible consideration. As indicated before, the duty of this Court is confined absolutely to ascertaining if any error of law, sufficient to disturb the judgment below, appears in the record. We are unable to find any error of that kind.

It is therefore ordered and adjudged that the petition for a rehearing as to all the appellants be, and the same is hereby, dismissed, and the order of the Court staying the remittitur herein be, and the same is hereby, revoked.

MESSRS. JUSTICES BLEASE, STABLER and CARTER concur.

MR. CHIEF JUSTICE WATTS: I dissent. I was ill at the time this cause was heard in the Court and did not participate in the hearing. I have considered the petition for a rehearing, however, with the record of the case for appeal, and, in my opinion, all the appellants should be granted a rehearing.

MR. JUSTICE COTHRAN: I concur in the conclusion of the Chief Justice.